## HOBOKEN LAND & IMPROVEMENT CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8173.

Circuit Court of Appeals, Third Circuit.
Argued March 17, 1943.
Decided Sept. 15, 1943.

John Enrietto, of Washington, D. C.
(C. F. Rothenburg and Hamel, Park &

Saunders, all of Washington, D. C., on the brief), for petitioner.

Helen Goodner, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

The taxpayer, petitioner on this appeal, is the Hoboken Land and Improvement Co., a New Jersey corporation with its office and principal place of business in Newark. Its appeal from the decisions of the Board of Tax Appeals involves income taxes for the calendar years 1934 and 1937. The three issues involved are not interrelated and will be separately considered.

### Depreciation.

The taxpayer has continuously been engaged in the business of owning and renting real estate, buildings and other structures. It claimed deductions for depreciation on "Piers and Waterfront" properties for the years 1934, 1936 and 1937. These were disallowed by the Commissioner, whose action was sustained by the Board, because of alleged excessive depreciation allowances in prior years by which it is said that petitioner recovered fully the cost of its depreciable assets. The taxpayer disputes this.

In 1926 Petitioner filed amended income tax returns and claims for refunds, for the years 1921 to 1925 inclusive, based on the claim that the depreciation sustained on its "Piers and Waterfronts" during that time was $741,679.55 in lieu of $385,561.55 as originally stated. The difference was due to the fact that on the amended return the taxpayer included in the basis for depreciation the cost of the land, a non-depreciable asset, in the assets classified as "Piers and Waterfronts". A revenue agent, in verifying the claim, examined the petitioner's books of account and allowed depreciation to the extent of $744,411.28. The tax liabilities of petitioner for the years 1921 to 1925 were adjusted accordingly and the petitioner received full benefit for the additional allowances for depreciation for those years.[1]

The aggregate cost of the buildings or structures in the properties classified as "Piers and Waterfronts" erected prior to 1932 was $1,684,393.26. The depreciation allowed for those years was in excess of that sum. In 1932 other buildings and structures were erected at a cost of $127,837. The depreciation allowed for 1932 and 1933, on "Piers and Waterfronts", which included the 1932 additions, exceeded that sum.

Land as such is a non-depreciable asset and has so been treated ever since the Revenue Act of 1916.[2] The difficulties in this case began when the taxpayer included the value of the land in calculating the depreciation base on its amended returns for 1921-1925 for the items which it called "Piers and Waterfronts". The fact that the mistake was made by an independent public accountant employed by the taxpayer does not make the latter's responsibility for the returns filed on its behalf any the less. Now, although the taxpayer concedes that it was at fault therein and benefited from its own error, it nevertheless contends that the government was equally at fault since its investigator, through the examinations of the returns and the taxpayer's records which he made, had opportunity to discover the error and correct it. Having failed to do so, the argument runs, the government should not be permitted to distort petitioner's income as affected by its depreciable property by charging up to petitioner over a short period depreciation which the taxpayer could advantageously spread out over a greater span of years. If the taxpayer had its way the depreciation taken on the land and erroneously allowed would not be taken into account in calculating the depreciation base of the buildings and structures at all but would be regarded as a partial restoration of the cost or other basis of the particular parcels of land. Thus there would be left room for the depreciation claimed in the tax years in question. But we do not think that the facts and the applicable statute support the conclusion thus urged.

The Board's findings clearly show that the returns did not indicate that, in calculating the depreciation, the taxpayer had taken into account the land val-

---

1 Cf. Virginian Hotel Corporation of Lynchburg v. Helvering, 1943, 63 S.Ct. 1260, 87 L.Ed. —.

2 Art. 162 of Treas.Regs. 33, 45, 62, 65, 69; Art. 202 of Treas.Regs. 74, 77; Art. 23(1)-2 of Treas.Regs. 86, 94.

ue. Our examination of those parts of the returns confirm such conclusion. The Board further stated that the revenue agent in making his determination of the depreciation was misled (not intentionally), by petitioner's claims and general ledger control account in which the total basis for the land and buildings and structures was reflected without segregation between parcels or between land and buildings. The taxpayer challenges this finding, pointing out that its property ledger, carrying separate accounts for each parcel of real estate, and segregating land and structures, was available to the agent along with the original returns, so that he could not have been misled. Although the agent did not testify we think the conclusion that the agent was misled was a finding within the Board's province as the trier of fact which cannot be upset on the record made and in view of the clearly established regulation that land was not a depreciable asset. The claimed depreciation was allowed as it actually appeared to have been sustained, on buildings and structures only. And claimed depreciation, though excessive, reduces the depreciation base, if it is allowed and results in a tax benefit.

Under the statutory provisions here involved the basis taken for depreciation is the adjusted basis provided in § 113(b). §114(a) of Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Acts pages 701, 866. Under § 113 the basis is the cost of the property adjusted "for exhaustion, wear and tear, obsolescence, amortization, and depletion, *to the extent allowed (but not less than the amount allowable)* under this Act or prior income tax laws." (italics added). The legislative purpose underlying the italicized words has a direct bearing on this case. It is set out in the margin.[3] It clearly evidences an intent that where the taxpayer has claimed and been allowed an excessive depreciation, the cost basis of the property for purposes of further depreciation shall be reduced to that extent.

It is not disputed that the taxpayer received a tax benefit from the allowance. From the Board's opinion it is also clear that the depreciation appeared to be claimed on depreciable assets. What the taxpayer had in mind or what mistaken basis of calculation was employed becomes immaterial. There is by hypothesis error in any depreciation claim which is excessive. But the quality or degree of error is immaterial under the statute. Excessive depreciation was allowed on the taxpayer's assets. The cost basis must be reduced accordingly.

Commissioner of Internal Revenue v. Saltonstall, 1 Cir., 1941, 124 F.2d 110, relied on by taxpayer is not in point. There a transaction was treated originally as a sale and the basis deducted to determine the gain. When it was later determined that the sales price should have been treated as

---

[3] S.Rep. No. 665, 72d Cong., 1st Sess., p. 29 (1939-1 Cum.Bull. (Part 2) 517), is as follows: "In subparagraph (B), relating to depreciation, etc., for the period since February 28, 1913, the bill requires that adjustment be made 'to the extent allowed (but not less than the amount allowable)' instead of 'by the amount  *  *  *  allowable' as in the prior Act. The Treasury has frequently encountered cases where a taxpayer, who has taken and been allowed depreciation deductions at a certain rate consistently over a period of years, later finds it to his advantage to claim that the allowances so made to him were excessive and that the amounts which were in fact 'allowable' were much less. By this time the Government may be barred from collecting the additional taxes which would be due for the prior years upon the strength of the taxpayer's present contentions. The Treasury is obliged to rely very largely upon the good faith and judgment of the taxpayer in the determination of the allowances for depreciation, since these are primarily matters of judgment and are governed by facts particularly within the knowledge of the taxpayer, and the Treasury should not be penalized for having approved the taxpayer's deductions. While the committee does not regard the existing law as countenancing any such inequitable results, it believes the new bill should specifically preclude any such possibility. Your committee has not thought it necessary to include any express provision against retroactive adjustments of depreciation on the part of the Treasury as the regulations of the Treasury seem adequate to protect the interests of taxpayers in such cases. These regulations require the depreciation allowances to be made from year to year in accordance with the then known facts and do not permit a retroactive change in these allowances by reason of the facts developed or ascertained after the years for which such allowances are made."

The House report is substantially the same. H.Rep.No. 708, 72d Cong., 1st Sess., p. 22 (1939-1 Cum.Bull. (Part 2) 472).

rent-income, the Commissioner unsuccessfully tried to treat the amount previously deducted as the cost basis for computing the gain, as depreciation claimed and allowed. Nor is Pittsburgh Brewing Company v. Commissioner of Internal Revenue, 1938, 37 B.T.A. 439, reversed on other grounds, 3 Cir., 1939, 107 F.2d 155, helpful since it involved an attempt to apply excessive depreciation, taken at a certain rate on one group of assets, to another, depreciated at a different rate. Here, of course, there was only one class of depreciable assets.

New Jersey Property Tax Adjustment.

This issue concerns New Jersey property taxes on other parcels of real estate, in the City of Hoboken, owned by the taxpayer. In May, 1933, taxpayer received from the collector of taxes of the City of Hoboken property tax bills for May, 1933, in the amount of $443,983.77 payable before June and December of that year. In December, 1933, the preliminary property tax bills for 1934, in the amount of $218,678.03, payable in 1934 were received. The final 1934 property tax bills in the amount of $426,-504.31, payable in 1934, were received in May. 1934.

The taxpayer successfully challenged these assessments in the New Jersey courts, claiming overvaluation of the property. That litigation was concluded when the City of Hoboken abandoned its appeal to the Supreme Court of New Jersey in 1936. As a result of its action, taxpayer had succeeded in abating $59,580 on its 1933 property tax and $58,123.42 on its 1934 property tax.

In its income tax returns for 1933 and 1934, the taxpayer, who was on an accrual basis, had deducted as taxes paid or accrued the amounts originally assessed for each of these years, including the amounts subsequently abated. In 1933 taxpayer had a net loss of $27,364.90.

The Commissioner in a deficiency notice sent to taxpayer, covering the years 1936 and 1937, held that the taxes abated were income to the taxpayer in the year 1936. The Board held that the abatement accrued to the taxpayer in 1936. The 1933 taxes were held to constitute income in 1936 to the extent they exceeded taxpayer's loss for that year, since the year 1933 was closed by the statute of limitations. That phase of the case is not before the Court on this appeal. It is the treatment accorded the 1934 abatement of which petitioner complains.

In the deficiency notice for 1936 the Commissioner disapproved of the taxpayer's deduction of property taxes payable in 1936 and substituted therefor taxes assessed in 1936 for 1937 and payable in 1937. In another deficiency notice for the taxable year 1934, he likewise substituted the 1935 property taxes, payable in 1935 but assessed in 1934, for the claimed deduction of 1934 property taxes payable in 1934, but assessed in 1933 as previously shown. The Board of Tax Appeals held that the taxpayer's method of keeping its books of account and accruing as taxes of the taxable year those which became due and payable in that year correctly reflected the taxpayer's income; that merely because taxes for a calendar year are based upon the assessed value of property on a schedule made up during a preceding taxable year is of no consequence upon the question whether a taxpayer's books of account kept in the manner by which this taxpayer kept its books truly reflects income. It therefore concluded that the taxpayer correctly accrued as taxes in 1934, the taxes levied by Hoboken for the support of the city government of that year, the year in which they became due and payable. This conclusion was undoubtedly correct. See Schock, Gusmer & Co., Inc., v. Commissioner of Internal Revenue, 137 F.2d 750, decided by this Court on August 23, 1943, which also involved Hoboken property taxes.

The Board was led to a discussion of this point by the taxpayer's contention before it, that the abated portion of the 1934 property taxes, which were deducted from taxpayer's 1934 gross income, but never paid, did not constitute taxable income in 1936, and that the deficiency for 1934 should be adjusted in accordance with the decision in E. B. Elliot Co. v. Commissioner of Internal Revenue, 1941, 45 B.T.A. 82. This contention the Board sustained. However, the taxpayer went further and claimed that it derived no benefit from the deduction of 1934 taxes since the Commissioner had disallowed that deduction and substituted therefor the 1935 property taxes. The Board, as has been indicated, deemed the Commissioner's corrections erroneous and finding that the property taxes for 1934 were properly deducted in the income tax return for that year, held that the deduction for accrued property taxes in 1934

should be reduced by the amount of 1934 property taxes abated. This is where the Board fell into error according to taxpayer's argument before this Court.

■ The contention is that the Board of Tax Appeals raised on its own motion and decided the issue, not raised by any of the pleadings, concerning the proper year of accrual of the property taxes for the year 1934. This it is said, was beyond the Board's power to do. Argument for the Commissioner concedes the general proposition that the Board has no jurisdiction to consider and decide an issue not raised in the pleadings, but says this proposition has no application here, because the Board did not go beyond proper bounds in this instance. With that we agree.

It must be remembered that the Board had before it two cases involving petitioner's tax liabilities for the years 1934 and 1936-1937. The two cases were consolidated at taxpayer's instance on Jan. 10, 1941. On June 16, 1941, the Commissioner filed an amended answer to the proceeding involving the year 1934. Paragraph 8 read:

"8. In the alternative if the Board in the consolidated case of petitioner, docket No. 102779, covering the years 1936 and 1937 holds that the final decision of the New Jersey authorities for the release, abatement or credit for Hoboken city taxes insofar as it relates to taxes accrued and deducted by petitioner in 1934 is not income in 1936 but should instead be eliminated from the item of tax deductions for 1934 previously taken and allowed, then net income for 1934 should be increased by $58,123.42 by reducing the deductions for taxes for the year 1934 by the same amount.

"Petitioner included in its deductions for taxes in 1934 as part of its Hoboken city property taxes $58,123.42.

"This amount was subsequently held by the official State and local reviewing authorities of the State of New Jersey to be excessive and not due and has never been paid.

"In his notice of deficiency for 1934, the Commissioner did not disturb said 1934 deduction."

The taxpayer's reply admitted that it had deducted $58,123.42 in its 1934 return and that it had never paid it, but denied all the other allegations. We think the issue, namely, that if the abatement of 1934 taxes was held not to be income in 1936, the 1934 deduction for taxes for the year 1934 should be reduced to that extent, was thus squarely raised by the pleadings and presented for hearing and decision by the Board. Having decided that the abatement did not constitute income in 1936, the Board had to determine the issue raised by the pleadings of whether it should go to reduce the 1934 deduction for 1934 property taxes. To determine this, a decision as to the proper year for deduction was necessary, at least so far as its application to 1934 was concerned. And that decision, as we have indicated, was correct. Deduction for the 1934 tax has been allowed by the decision of the Board and is affirmed by this Court.

### Loss on Stock of First National Bank of Hoboken, New Jersey.

In its income tax return for 1934 the taxpayer reported a capital loss of $243,302.72 which arose from a transaction presently to be detailed. Its reported capital gains for the year totaled $89,584.97. The Commissioner disallowed the claimed capital loss, the basis for which was as follows:

The taxpayer, on November 30, 1934, owned 122,013 shares of the capital stock of the First National Bank of Hoboken, New Jersey. The Hoboken Bank had a total outstanding capital stock of 156,250 shares having a par value of $4 per share.

On November 27, 1934, the Hoboken Bank and the First National Bank of Jersey City, New Jersey, entered into a written agreement whereby the Jersey City Bank agreed to take over all the assets of the Hoboken Bank. For these, the Jersey City Bank was to pay $10,307,376.10 by assuming Hoboken's liabilities in that amount and "by making available through a credit to be made on the books of Second Party [Jersey City Bank] to First Party [Hoboken Bank] in liquidation the sum of $625,000 to be expended for the purpose of an increase in the capital stock of Second Party in favor of the stockholders of First Party and in the manner hereinafter provided." The "hereinafter" had best be quoted:

"The Second Party agrees, subject only to the authorization, approval and waiver of its stockholders to effect an increase in its capital stock from $1,600,000 to $2,225,000 or in the amount of $625,000 to make available for purchase by stockholders of First Party all of the amount of said increase in capital at $100 per share or at the par value thereof, it being understood and agreed by and between both parties

hereto, that the sum of $625,000.00 realized by the First Party and made available to stockholders of First Party through the purchase of its assets and the assumption of its certain liabilities under this agreement, would be under appropriate subscriptions and agreements, used and expended by the stockholders of First Party for the purchase and payment of said increase in the capital of Second Party; * * *"

The Jersey City Bank obtained permission from its shareholders and the comptroller of currency to increase its capital stock from $1,600,000 to $2,225,000 and to change the par value of its shares from $25 to $100.

A liquidating agent was appointed for the Hoboken Bank. All its shareholders except a few agreed to turn in their Hoboken shares for those of Jersey City Bank, which they would ultimately get. 214 28/100 shares of Jersey City Bank stock were unsubscribed for by the failure of the non-assenting shareholders of Hoboken to join in the plan. However, before the transfer date, the taxpayer itself agreed to subscribe for those shares. On or before December 28, 1934, the Hoboken shares were delivered to the liquidating agent.

At the close of business on December 28, 1934, Hoboken transferred its assets to Jersey City which assumed the former's liabilities and executed and delivered to the liquidating agent its check for $625,000. The taxpayer delivered to the liquidating agent its check for $21,428 for 214 28/100 shares of Jersey City Bank shares. The checks were deposited by the agent in an account in the Jersey City Bank in his name as liquidating agent. The checks were paid by the drawee banks on the same day. On that day, also, the agent executed and delivered his check for $625,000 payable to the Jersey City Bank which on the next day delivered 6,250 shares of its capital stock. Finally the liquidating agent paid the non-assenting shareholders $4 per share out of his bank account.

The theory of the Commissioner's disallowance of the taxpayer's claim for capital loss and the Board's affirmance was that the taxpayer had, pursuant to a plan of reorganization, exchanged its stock in a corporation a party to a reorganization (Hoboken Bank) solely for stock of another corporation a party to a reorganization (Jersey City Bank) and that consequently no loss could be recognized. § 112(b) (3) of the Revenue Act of 1934.[4] The transaction was said to come within the type of reorganization defined in § 112(g)(1)(B) of the 1934 Act (now amended by § 213(g) (1)(B) of the Revenue Act of 1939, 26 U.S. C.A. Int.Rev.Acts p. 1177). The taxpayer stoutly resists this conclusion.

Section 112(g)(1)(B) as amended[5] defines a reorganization as "the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded; * * *." To sustain the Commissioner's action two contentions of the taxpayer must be met.

The first is that there was no plan of reorganization that fitted § 112(g)(1) (B) because part of the consideration furnished by Jersey City Bank was $625,000 cash which the shareholders of Hoboken were not required to invest in Jersey City Bank stock. The facts found by the Board point to a contrary conclusion. The clear and express provision of the agreement between Hoboken Bank and Jersey City Bank, quoted in part above, is to the effect that the $625,000 credit made available to Hoboken's shareholders was to be "used and expended" by the shareholders of Hoboken "for the purchase and payment" of Jersey City's $625,000 increase in its capital stock. None of Jersey City shareholders purchased any of the increased stock. All of it was purchased by Hoboken shareholders, even though the completion of the purchase required that one of them, the taxpayer, put up cash equal in amount to that portion for which some shareholders would not exchange their stock. The $625,000 was used to facilitate Jersey City's acquisition of Hoboken. It was stated by the Board, and not denied by the taxpayer, that

[4] "Stock for stock on reorganization. No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization." 26 U.S.C.A. Int.Rev. Acts page 692.

[5] The 1939 Amendments were made effective as of the date of 1934 Act. § 213 (g) (2). Id. at page 1178.

it came into the transaction only because an increase in the capital stock of a national bank had to be paid for in cash on a sale, the two banks having found it not feasible to merge. The $625,000 played no part in the result. Jersey City's check was deposited in the Jersey City Bank, paid off, and a check in a like amount in its favor was delivered to it by the Hoboken Bank liquidator all within the same day. We think all the evidence sustains the conclusion reached by the Board that there was a plan of reorganization under § 112(g)(1)(B).

The second point urged is that § 112(g)(1)(B) requires that the properties must be acquired in exchange solely for the voting stock of the acquiring corporation, the assumption of liabilities excepted. See Helvering v. Southwest Consolidated Corp., 1942, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789. Here, says the taxpayer, the non-assenting shareholders of Hoboken were paid in cash by Jersey City Bank, which cash came out of the $625,000. The non-assenting shareholders received $21,428. Taxpayer paid to the liquidating agent $21,428. The government contends that the taxpayer's $21,428 was used to pay off the non-assenting shareholders. The Board's opinion indicates that this was the case. We agree.

As already stated, the agreement between the Hoboken and Jersey City Banks contemplated and provided that all of the $625,000 was to be used to acquire Jersey City's stock. There is nothing to indicate that any part of it was to go to pay off non-assenting Jersey City shareholders. Nor was it shown by the taxpayer that it was in fact so used. The terms of the agreement are quite clear and what was done followed the course contemplated therein. The cash paid to non-assenting shareholders came not from the acquiring corporation but from a third party, the taxpayer, who then received the Jersey City shares which would have gone to the non-assenting shareholders had they participated. Helvering v. Southwest Consolidated Corp., supra, differs to that extent that there the money was furnished by a third person as part of a loan transaction in which the acquiring corporation was the debtor so that it was the same as if the latter had made the payment itself.

The decisions of the Board of Tax Appeals are affirmed on all three of the issues involved.