WESTFIR LUMBER COMPANY (A DISSOLVED OREGON CORPORATION), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7340, 7341. Promulgated October 22, 1946.

*Leon de Fremery, Esq.,* for the petitioner.
*T. M. Mather, Esq.,* for the respondent.

### OPINION.

MURDOCK, *Judge:* The Commissioner determined a deficiency of $857.11 in the petitioner's income tax for 1941 and deficiencies of $35,305.47 and $20,391.17 in excess profits tax for 1941 and 1942. A number of issues have been settled by stipulation of the parties. The only one left for decision is whether the petitioner acquired certain assets in a reorganization in 1936 so that it is entitled to use as a basis for depreciation and for invested capital purposes the basis to Western Lumber Co. The facts have been stipulated and the stipulation is adopted as the findings of fact.

The petitioner filed its income and excess profits tax returns for the calendar year 1941 with the collector of internal revenue at Portland,

Oregon, and filed its excess profits tax return for the calendar year 1942 with the collector of internal revenue at San Francisco, California.

Western Lumber Co., hereinafter referred to as Western, was a corporation organized under the laws of Oregon. It was engaged in the lumber business. It issued $1,150,000 face value of first mortgage bonds and $536,000 face value of debentures in 1927. Each bond and each debenture was of the face value of $1,000. It never paid any of the interest coupons on the bonds and indentures. It was also in default, at the beginning of 1933, for failure to pay its taxes on the mortgaged property. The defaults continued. The trustees under the bond indenture gave notice in October 1935 that all of the principal upon the bonds and debentures was immediately due and payable.

A bondholders' and debenture holders' protective committee was organized and the committee entered into an agreement in December 1935 with depositing bondholders and debenture holders. A plan of reorganization provided in that agreement, which was ultimately followed, was that a new corporation should be formed; foreclosure should take place; the new corporation should have 10,800 shares of preferred stock, each of the par value of $100, and 10,768 shares of common stock, each of the par value of $1, but both having equal voting rights; the new corporation was to issue one share of preferred and six-tenths of one share of common for each $100 of principal of the bonds, and eight-tenths of one share of common for each $100 of principal of the debentures; the committee was to acquire the hypothecated properties at the foreclosure sale and then transfer them to the new corporation; and the new corporation was to acquire all of the remaining property of Western in exchange for the release by the new corporation of all liability of Western on the deposited bonds and debentures, and the assumption by the new corporation of all then existing indebtedness of Western other than that pertaining to the issues of bonds and debentures.

The hypothecated properties were sold under the foreclosure. The committee purchased the properties at the foreclosure sale, subject to taxes, for $72,790.24. It was authorized by the court to make payment for the property by delivering bonds of Western. The net proceeds of the foreclosure sale amounted to $69,047.69. The court deducted that amount in determining the amount of the deficiency judgment.

All of the outstanding debentures and all but 29 of the bonds were deposited with the committee at the time of the foreclosure sale.

The petitioner was organized as the new corporation, and on May 5, 1936, it accepted an offer of the committee to assign the rights of the committee as purchaser at the foreclosure sale and to transfer the equity in the deficiency judgment to the petitioner in exchange for all of the authorized capital stock of the petitioner. The directors of the petitioner at the same meeting agreed to pay all of the indebtedness of

Western except that on the bonds and debentures. An agreement was entered into by the committee, Western, and the petitioner under which the petitioner acquired all of the unmortgaged assets of Western. Western at that time had unsecured debts.

A part of the consideration for the unmortgaged assets of Western was the agreement of the petitioner, dated May 18, 1936, to pay to Western for the nondepositing bondholders, the pro rata portion of the consideration to which they would be entitled. But the agreement provided that the nondepositing bondholders should have the right to deposit their bonds at any time prior to the time when they might receive payment in cash.

The bondholders' committee assigned to the petitioner on May 8, 1936, all of its interest as the successful bidder at the foreclosure sale. The assets of Western at that time included more than $10,000 in cash.

Each bondholder who failed to take advantage of his right to deposit his bonds and to accept his proportionate part of the stock of the petitioner was entitled under the agreement of May 18, 1936, to receive as his pro rata share of the net value of the unmortgaged assets $84.81 for each $1,000 bond held by him and was also entitled to receive as his pro rata share of the net proceeds of the foreclosure sale $63.93 for each $1,000 bond owned by him.

Twenty-nine bonds remained undeposited on May 28, 1936, but it was known prior to that date that 16 of those bonds would be deposited, and they were deposited on or before the middle of June 1936. The petitioner, on May 28, 1936, paid to the special master in the foreclosure proceedings $831.09, representing the pro rata portion of the net proceeds of the foreclosure sale, at $63.93 per bond, applicable to 13 bonds, and on June 26, 1936, it paid to the corporate trustee under the bond indenture $1,102.53 representing the pro rata portion of the net value of the unmortgaged assets at $84.81 per bond applicable to the 13 bonds.

The petitioner issued its entire authorized capital stock to voting trustees for the bondholders and debenture holders on July 31, 1936. The voting trustees issued certificates to the depositing bondholders and debenture holders, except that the voting trustees retained voting trust certificates for 10 shares of preferred and 6 shares of common for possible issue to the holder of the 1 remaining undeposited bond.

Twelve of the 13 remaining undeposited bonds were deposited on or about August 1, 1936, and their owners accepted stock under the plan of reorganization. Thereupon, the corporate trustee refunded to the petitioner $1,784.88 and retained only $63.93, plus $84.81, or a total of $148.74 for possible payment to the holder of the remaining undeposited bond, the owner of which could not be located at that time. Subsequently, on March 13, 1939, that remaining bond was presented and the owner thereof chose to receive the $148.74 in cash.

The only difference between the parties is whether the 1936 transaction was a reorganization within the definition of that term contained in section 112 (g) (1) (B) of the Revenue Act of 1936, as amended by section 213 (g) of the Revenue Act of 1939. The pertinent portion of the definition is as follows:

> The term "reorganization" means * * * (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded * * *.

The petitioner argues that this case is controlled by the decision in *Southland Ice Co.*, 5 T. C. 842, and there was a reorganization, whereas the respondent deems that case distinguishable.

The respondent argues that the assets of Western were not transferred to the petitioner solely for the petitioner's voting stock, as required under *Helvering* v. *Southwest Consolidated Corporation*, 315 U. S. 194. He also cites *Central Kansas Telephone Co.* v. *Commissioner*, 141 Fed. (2d) 213. He says that the petitioner's contention must fail, first, because the interest of the holders of the 29 undeposited bonds in the mortgaged assets was acquired for a promise to pay them cash rather than stock of the petitioner, and, second, because the unhypothecated assets were not acquired for stock, but were acquired partly in consideration of the obligation of the petitioner to pay cash for the interest of the nondepositing bondholders in those assets and to pay cash to the unsecured creditors for their undivided interest in those assets, while the interest of the depositing bondholders in those assets was acquired as paid-in surplus.

The Supreme Court said in the *Southwest Consolidated Corporation* case, *supra*, that the assets of the transferor corporation must be acquired in exchange "solely" for "voting stock" of the transferee, and since "solely" leaves no leeway, voting stock, plus some other consideration, does not meet the statutory requirement. The cited cases have distinguished between a situation in which some of the assets have been purchased for cash and the situation where the acquiring corporation has given only stock but has not acquired all of the transferor's assets. The present case is like the *Southland Ice* case and falls into the second group.

All but one of the bondholders eventually accepted stock for their interests. Yet the situation would not differ in principle if all 29 of those who did not deposit their bonds immediately had elected to take cash instead of stock for their interests. The present case is unlike the cases cited by the respondent in that here no interest was purchased for new cash obtained through borrowing, through the sale of stock, or through any other transaction with a third party. The

petitioner started with no cash of its own. The only cash involved was cash which the transferor had on hand at the time of the transaction. The cash equivalent of the interests of the nondepositing bondholders in the assets of Western and in the amount realized on foreclosures was determined to be $148.74 per bond. The assets available for transfer included sufficient cash to pay that amount to all of the nondepositing bondholders, and a sufficient amount for that purpose was actually set aside for them. The assets of Western to that extent were never really acquired by the petitioner. The one bondholder who never agreed to the plan never agreed to have his share of the assets of Western transferred to the petitioner, but insisted upon having his share in those assets paid to him in cash. That was done. Thus, Western, under this plan of reorganization, never became the beneficial owner of that nondepositing bondholder's interest in the assets of Western. But the assets actually acquired were acquired solely for stock.

The tax consequences of a complicated plan like this should not depend upon the trivial circumstance of whether the cash going to a nondepositing bondholder was taken out of the pot before it was turned over to the petitioner, or whether the petitioner, as a condition of receiving the other assets, had to place some of the cash of Western in the hands of a fiduciary for the nondepositing bondholder. The effect is the same in either case and the tax consequences ought to be the same. The petitioner, which had no cash to purchase any of the assets, can not fairly be said to have purchased some of them by paying as consideration the cash which also was a part of them. Not owning any, it could not purchase one part with another part. The mere statement of the proposition shows that no purchase is involved in such a transaction. Neither the petitioner nor Western incurred a debt to supply cash for the share of any nonassenting bondholder. These circumstances adequately distinguish the present case from those cited by the respondent in which it was pointed out that the reorganization and nonrecognition provisions involved herein do not cover sales of assets but only cover exchanges solely for stock of the acquiring corporation.

The respondent makes the further argument that the acquisition of the unhypothecated assets was a separate transaction from the acquisition of the mortgaged assets and no stock was given for the unhypothecated assets. It is apparent that all of the transactions involved herein were a part of an integrated plan of reorganization, all parts of which were interdependent. Cf. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179. It is apparent also that the only consideration given by the petitioner to the depositing bondholders, not only for their interest in the mortgaged assets but also

for their interest in the remaining assets, was stock of the petitioner. The respondent continues this argument to say that the interest of the unsecured creditors in the unhypothecated assets was acquired in consideration of the petitioner's agreement to pay cash to them for those interests. This contention is answered by the stipulation, which shows that the petitioner assumed all of the existing indebtedness of the petitioner other than that pertaining to the issues of bonds and debentures i. e., it assumed the liability of Western to these unsecured creditors. The stipulated facts bring this case within the provision of the law that the assumption by the acquiring corporation of a liability of the transferor shall be disregarded.

It thus appears that the petitioner acquired substantially all of the assets of Western solely in exchange for all of its voting stock, since, as the statute provides, the assumption by the petitioner of certain liabilities of Western is to be disregarded. We conclude that there was a reorganization within the meaning of the statute relied upon by the petitioner and, therefore, the petitioner, in accordance with the stipulation of the parties, is entitled to use Western's basis for the assets thus acquired.

*Decision will be entered under Rule 50.*