SAN ANTONIO TRANSIT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 15411, 41321.   Filed September 11, 1958.

*Robert F. Ritchie, Esq.*, and *Leslie Byrd, Esq.*, for the petitioner. *Nelson P. Rose, Esq.*, for the respondent.

### OPINION.

FORRESTER, *Judge:* The facts of the instant case have been fully stipulated and the case has been submitted pursuant to Rule 30 of our Rules of Practice. All but one of the issues raised by the pleadings have been settled. The parties have submitted a supplemental stipulation reflecting their concessions in respect of the settled issues. The stipulations and the exhibits attached thereto are adopted and by this reference made a part hereof.

The Commissioner has determined deficiencies and overassessments in income tax, deficiencies in declared value excess-profits tax, and deficiencies in excess profits tax liability for the years and in the amounts as follows:

| Year | Tax | Deficiency | Over-assessment |
|---|---|---|---|
| 1944 | Income | | $85,943.04 |
|  | Declared value excess-profits | $127,640.31 | |
|  | Excess profits | 1,166,258.73 | |
| 1945 | Income | | 35,087.82 |
|  | Excess profits | 71,812.70 | |
| 1946 | Income | | 17,713.14 |
|  | Excess profits | 42,634.66 | |
| 1947 | Income | 48,743.85 | |

The deficiencies result principally from the respondent's determination that the petitioner's tax basis for determining depreciation,

gain or loss, and equity invested capital with respect to the Smith-Young Tower building (hereinafter referred to as the Tower building) for its taxable year ended May 31, 1944, and equity invested capital for the other taxable years, is the cost of the property to the petitioner. The petitioner contends that the proper basis of the property is the basis it had in the hands of petitioner's predecessor, the Smith Brothers Properties Company.

Stated more succinctly the issue is whether basis is to be determined under the provisions of section 113 (a) or 113 (a) (22) of the Internal Revenue Code of 1939. This in turn is dependent upon whether or not the petitioner acquired the Tower building in a tax-free corporate reorganization pursuant to section 112 (b) (10) of the Internal Revenue Code of 1939. The material parts of these statutory provisions are set out in the margin.[1]

Before proceeding to a statement of the material facts, it should be mentioned that the petitioner has previously litigated the question of whether or not it acquired the Tower building in a nontaxable reorganization. In *Scofield* v. *San Antonio Transit Company*, 219 F. 2d 149 (C. A. 5, 1954), certiorari denied 350 U. S. 823, the Court of Appeals for the Fifth Circuit held that the taxpayer did not acquire the Tower building in a nontaxable reorganization. As a consequence thereof petitioner was required to use as a basis its cost in computing depreciation and equity invested capital. The taxable year involved in that case began on June 1, 1942, and ended on May 31, 1943.

The doctrine of collateral estoppel does not preclude us from con-

---

[1] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; except that—

* * * * * * *

(22) PROPERTY ACQUIRED ON REORGANIZATION OF CERTAIN CORPORATIONS.—If the property was acquired by a corporation upon a transfer to which section 112 (b) (10), or so much of section 112 (d) or (e) as relates to section 112 (b) (10), is applicable, then, notwithstanding the provisions of section 270 of the National Bankruptcy Act, as amended, the basis in the hands of the acquiring corporation shall be the same as it would be in the hands of the corporation whose property was so acquired, * * *

SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) EXCHANGES SOLELY IN KIND.—

* * * * * * *

(10) GAIN OR LOSS NOT RECOGNIZED ON REORGANIZATION OF CORPORATIONS IN CERTAIN RECEIVERSHIP AND BANKRUPTCY PROCEEDINGS.—No gain or loss shall be recognized if property of a corporation (other than a railroad corporation, as defined in section 77m of the National Bankruptcy Act, as amended) is transferred, in a taxable year of such corporation beginning after December 31, 1933, in pursuance of an order of the court having jurisdiction of such corporation—

(A) in a receivership, foreclosure, or similar proceeding, or

(B) in a proceeding under section 77B or Chapter X of the National Bankruptcy Act, as amended, to another corporation organized or made use of to effectuate a plan of reorganization approved by the court in such proceeding, in exchange solely for stock or securities in such other corporation.

sidering this issue for we can reexamine a prior litigated issue where there has been "a change or development in the controlling legal principles." Cf. *Commissioner* v. *Sunnen*, 333 U. S. 591, at 599. It is petitioner's contention that sections 112 (b) (10) and 113 (a) (22) represent a change in the controlling legal principles, that these sections were not available to it with respect to its earlier taxable year, and that their application renders necessary a contrary holding.

Sections 112 (b) (10) and 113 (a) (22) were added to the Internal Revenue Code of 1939 by sections 121 (a) and 121 (c) (3) of the Revenue Act of 1943. By the terms of section 121 (e) of the same Revenue Act these sections were "*deemed* to be included in the revenue laws respectively applicable to *taxable years beginning after December 31, 1933.*" (Emphasis supplied.) Their inclusion was limited, however, in that it was not to "*affect* any tax liability for any *taxable year beginning prior to January 1, 1943.*" (Emphasis supplied.)

Quite clearly sections 112 (b) (10) and 113 (a) (22) were not available to petitioner with respect to its earlier litigation since the taxable year involved therein began on June 1, 1942. Our problem is to determine whether or not their inclusion within the Internal Revenue Code represents a change in the controlling legal principles as to the years involved in this case and, as demonstrated by our holding, our answer is affirmative.

Petitioner is a Delaware corporation operating in the State of Texas and maintaining its principal place of business in the city of San Antonio, Texas. It filed its income and excess profits tax returns for the fiscal years ended May 31, 1944, 1945, 1946, and 1947 with the collector of internal revenue at Austin, Texas.

The material facts of the corporate reorganization have been so adeptly summarized by Judge Dawkins in his opinion in the earlier *San Antonio Transit Company* case, *supra*, that a restatement of these facts in their entirety seems unnecessary. Instead, with one exception to be noted later, we will quote freely from the opinion of the earlier case and add thereto (in brackets) only those facts which we regard as helpful in obtaining a clearer picture of the whole transaction. The jurisdictional and other facts having to do with the taxable year herein but not therein involved will also be included.

The pertinent facts * * * are as follows: Smith Brothers Properties Company, a Texas corporation (hereinafter called the old corporation) owned certain realty in San Antonio upon which it constructed buildings for its own use and for lease to others. Among the buildings it owned was the Smith-Young Tower building (hereinafter called Tower building) which it built in 1928 at a cost of $2,070,709.09, financed by first mortgage bonds in the amount of $1,900,000. A first mortgage deed of trust was executed to secure the payment of the bonds and interest coupons, whereby the property was conveyed to trustees.

By the end of 1930, the old corporation owned seven or eight business properties in San Antonio, and owed considerable debts secured by various other indentures

against its realty. For the purposes of this * * * [proceeding] the entire indebtedness may be categorized into two groups of debts: (1) the bonded indebtedness on the Tower Building, and (2) the bonded and otherwise secured debts relating to other properties, taxes and unsecured claims.

A protective committee was formed by the Tower building bondholders and was vested with legal title to the bonds through the use of certificates of deposit. In November, 1931, the trustees named in the Tower building deed of trust declared all the bonds secured thereby due and payable; and in January, 1932, these trustees filed suit against the old corporation, seeking recovery of the entire debt due on the bonds, foreclosure of the bond lien and the appointment of a receiver. A receiver was appointed; but this did not vest him with title to the Tower building, which was still in the old corporation. Answer was filed by the latter with a cross-claim alleging usury.

In the latter part of 1932, or early 1933, the old corporation defaulted on its other secured debts, and all of its other properties were taken over by one Gill, agent for Massachusetts Mutual Life Insurance Company (hereinafter called Massachusetts), the holder of second and third mortgage notes against some of the properties. Gill was not judicially appointed, and the procedure employed by this group of creditors appears to have been entirely extra-judicial at that time. At any rate, the properties were in the hands of the creditors and were operated by Gill separately from the Tower building, then being operated by the receiver appointed in the trustees' foreclosure suit.

There was some maneuvering in the foreclosure suit, with respect to the defense of usury, as well as the asserted personal liability of some of the stockholders of the old corporation; and as a consequence matters remained in substantially the same condition from early 1933 until 1937.

[On November 3, 1936, Century Investment Company (hereinafter called Century) was formed by a group of the creditors of the old corporation who had secured claims against the corporate property other than the Tower building.]

On April 1, 1937, Century * * * acquired a majority of the common stock of the old corporation and also purchased all the defaulted secured obligations then held by Massachusetts. Century then filed a foreclosure suit against the old corporation on the properties securing those obligations, a completely separate judicial action from the one already pending by the trustees of Tower building deed of trust. Pursuant to a previously arranged plan, all of those properties, other than the Tower building, were purchased at the Century's foreclosure sale by Plaza Company, created by Century for that particular purpose. The old corporation had no equity in the properties so sold, and it executed a quitclaim deed to Plaza Company for all the properties thus purchased. This was accomplished on or by May 4, 1937.

Meanwhile, in October of 1936, the protective committee for all the holders of Tower building bonds, entered into an agreement with Dallas Rupe & Son, Inc. (hereinafter called Rupe), also holder of some of the Tower bonds, for the "reorganization" of the Tower Building alone. Under this agreement Rupe deposited with the committee a sum sufficient to buy the non-participating bonds at the rate of $20.00 for each $100.00 of principal amount of said bonds. The plan provided Rupe should receive voting trust certificates for the number of shares in a new company to which the non-participating bondholders would have been entitled; and, in addition, Rupe was to receive certificates covering three per cent of the shares to be issued to all participating bondholders, including his own, and those purchased. In the plan Rupe also agreed to negotiate a loan to the new corporation for $100,000, to be secured by a first mortgage on the Tower

building when acquired by it. The plan further provided the participating bondholders should receive voting trust certificates representing one share of common stock in the new corporation for each $100 of principal amount of bonds surrendered.

Pursuant to this agreement, the protective committee intervened in the foreclosure against the Tower building, setting forth the plan. The committee also agreed to assign all deficiency claims for the balance of principal and interest on the old bonds after the foreclosure to the old corporation, and the latter, in turn, agreed to withdraw all defenses to foreclosure proceedings.

On May 27, 1937, the court approved the plan and ordered the sale of the Tower building by the receiver appointed in 1933, and it was bid in by a nominee of the committee (not otherwise identified in the record) at foreclosure sale August 3, 1937, for $335,160. This sale was confirmed on August 27, following; and on August 31 the receiver conveyed the property, including building, lot, personal property and accounts receivable up to July 31, 1937, to Smith-Young Tower Corporation, the taxpayer herein.

On the same date, the price bid by the committee's nominee was paid to the receiver by delivery of $1,667,000 face value of bonds for a credit of $300,060 and the balance of the bid, or $35,100, was paid by the committee with the cash received from Rupe under the plan previously mentioned. At the same time taxpayer issued 18,620 shares of its voting stock to voting trustees provided in the plan in consideration of all property conveyed to it. The trustees in turn issued stock to the bondholders at the rate previously stated of one share for each $100 in principal amount of bonds surrendered—16,970 shares to all participating bondholders, and 1,650 shares to Rupe for bonds purchased from nonparticipants. Later Rupe received 558 additional shares, amounting to three per cent of the entire issue to participating bondholders under the arrangement above mentioned with the Bondholders Committee. The deficiency claims against the old corporation were transferred to it, thereby being extinguished by confusion; and the old corporation at the same time executed a quitclaim deed to all property transferred to the taxpayer.

On December 15, 1943, petitioner sold the Tower building and the land upon which it was situated along with other items of property for the total sum of $476,813.12. The adjusted basis of such other items of property as at December 15, 1943, was $19,835.98.

The parties have stipulated that (a) if it is determined that the Tower building was acquired by petitioner in a tax-free transfer pursuant to section 112 (b) of the Revenue Act of 1936,[2] the adjusted basis of the building as of December 15, 1943, was $1,477,515.16, and (b) if it is determined that the building was not acquired by petitioner in a tax-free transfer pursuant to section 112 (b) of the Revenue Act of 1936,[3] then the adjusted basis of the building as of December 15, 1943, was $709,553.40.

---

[2] It appears that the parties have inadvertently stipulated to the wrong Revenue Act. Section 112 (b) (10), the applicable subsection, is an amendment to the Internal Revenue Code of 1939 and was added by section 121 (a) of the Revenue Act of 1943, 58 Stat. 21, 41–42. Section 121 (e) of the Revenue Act of 1943 provides that section 121 (a) "shall be *deemed* to be included in the revenue laws respectively applicable to taxable years beginning after December 31, 1933, *but shall not affect any tax liability for any taxable year beginning prior to January 1, 1943.*" (Emphasis supplied.)

[3] See footnote 2, *supra.*

As mentioned earlier, the question presented involves a redetermination of petitioner's basis of the Tower building. This in turn depends upon whether the petitioner acquired the Tower building in 1937 as the result of a nontaxable reorganization.

Petitioner contends that the transfer of the Tower building to it on August 31, 1937, meets the requirements of a nontaxable reorganization under section 112 (b) (10) of the Revenue Act of 1936 [4] in that the transfer occurred in a taxable year beginning after December 31, 1933, that the transfer was in pursuance of an order of a State court having jurisdiction over the transferor-corporation in a receivership proceeding, that petitioner had been organized to effectuate the plan of reorganization approved by the State court in such proceeding, and that petitioner gave up only stock in itself in exchange for the transfer to it of the Tower building.

Respondent contends that petitioner did not acquire the Tower building in a nontaxable reorganization pursuant to section 112 (b) (10) in that (a) petitioner did not acquire "property of a corporation," (b) the consideration given up by petitioner was not "solely * * * stock or securities," and (c) the requisite "continuity of interest" between the old corporation and the petitioner was not preserved in the reorganization.

In answering the primary question presented we will take up each of respondent's contentions in the order presented above.

1. Did petitioner acquire "property of a corporation"? Our answer must be in the affirmative.

Respondent contends that it is noteworthy that the language of section 112 (b) (10) reads "property of a corporation" and not "all or any part of the property of the transferor." He argues that had Congress intended to open the doors to a series of nontaxable reorganizations of a single enterprise it would have used the latter-quoted phrase rather than merely the word "property." Due to the absence of the phrase "all or any part" he urges that we should interpret the word "property" as having been used in the quantitative sense of meaning "all or substantially all the property" of the transferor.

The obvious answer to respondent's contention is that the statute does not state "all or substantially all the property" but only "property." In addition, the statutory definition of "reorganization" set forth in section 112 (g), I. R. C. 1939, includes the phrase "substantially all the properties" but this section specifically excepts section 112 (b) (10) from its requirements. This exception of section 112 (g), like 112 (b) (10), was added by the Revenue Act of 1943, being section 121 (d) (4) thereof; consequently, it cannot be

---

[4] See footnote 2, *supra*.

said that Congress did not intend that the word "property" should be given its common meaning.

Applying common meaning to the word "property," we interpret it as meaning either a specific item or a group or composite of specific items. It therefore would ordinarily be thought of as comprising either all or any part of the transferor-corporation's total assets.

Further, in examining the legislative history of sections 112 (b) (10) and 113 (a) (22), we have been unable to find any information which would lead us to conclude that Congress sought to use the word "property" in terms of the totality or even of a substantial part of a transferor-corporation's possessions. Nor are we able to find any prohibition or limitation in respect of divisive or multiple reorganizations of bankrupt or insolvent corporations under either of these sections. In this regard the references in section 112 (b) (10) to foreclosure and to proceedings "under section 77B or Chapter X of the National Bankruptcy Act, as amended," are especially significant. It is axiomatic that a foreclosure usually affects only one property, and both section 77B, 11 U. S. C., section 207 (b) (10), and chapter X, 11 U. S. C., section 616 (2), provide that a plan of reorganization "may deal with all or any part of the property of the debtor." See *In re Prudence Bonds Corporation*, 79 F. 2d 205, certiorari denied 296 U. S. 652, where Judge Augustus N. Hand, speaking for the court, said at page 208: "There is nothing in section 77B precluding a series of reorganizations, and * * * [the act] provides that a plan of reorganization 'may deal with all or any part of the property of the debtor.' "

It seems highly unlikely to us that Congress would specifically refer to section 77B if it did not intend to include all types of reorganizations allowed therein.

We therefore hold that for purposes of section 112 (b) (10) the word "property" means a transfer of all or any part of the transferor-corporation's assets.

2. Was the Tower building acquired by petitioner "solely" in exchange for its "stock or securities"? Once again our answer must be in the affirmative.

It is clear from the facts that the petitioner did not provide nonqualifying consideration. The cash which was paid to the nonparticipating bondholders originated in Rupe who then succeeded to their interests. The only consideration which flowed from petitioner was its own stock and such consideration meets the statutory requirements of section 112 (b) (10).

Respondent's argument, although far from clear, appears to be that the transaction when viewed in its entirety represents an indirect payment of cash by the petitioner to the nonparticipating bondholders. He argues that the whole arrangement was tantamount to Rupe's having subscribed for and paid in cash the sum of $35,100 in exchange for

stock in the petitioner, which cash was used by the bondholders committee to purchase the interest in the Tower building owned by the nonparticipating bondholders.

While we agree that the contract between Rupe and the bondholders committee had the same effect as an executory contract to purchase stock in petitioner at a future date, we can see no way of tracing the funds provided by Rupe to the petitioner. Although petitioner was organized prior to the actual transfer of the funds to the bondholders committee there is nothing which leads us to believe that the bondholders committee was acting as petitioner's, rather than Rupe's, agent in purchasing the nonparticipating bondholders' interests in the Tower building. On the contrary the evidence indicates perfectly normal business reasons for arranging the purchase agreement in the way it was finally accomplished.

Respondent cites *Helvering* v. *Southwest Corp.*, 315 U. S. 194, as an instance where an indirect payment to nonassenting bondholders was held to constitute nonqualifying consideration. That case is distinguishable in that the acquiring corporation assumed an obligation to repay in cash the funds advanced to purchase the interests of the nonparticipating bondholders.

*Hoboken Land & Improvement Co.* v. *Commissioner*, 138 F. 2d 104 (C. A. 3, 1943), affirming 46 B. T. A. 495, is a much more analogous case. There an individual stockholder of the acquiring corporation furnished funds which were used by the liquidating agent of the acquired corporation to purchase the interests of the nonparticipating stockholders of the acquired corporation. In exchange for providing such funds the above-mentioned stockholder received the shares of stock which the nonparticipating stockholders would have received had they chosen to participate in the plan of reorganization. The applicable statutory provision was section 112 (g) (1) (B) of the Revenue Act of 1934, which section provides that the consideration given up by the acquiring corporation must be "solely for all or a part of its voting stock." The Court of Appeals in holding that only qualifying consideration had been paid by the acquiring corporation stated:

The cash paid to non-assenting shareholders came not from the acquiring corporation but from a third party, the taxpayer, who then received the * * * shares which would have gone to the non-assenting shareholders had they participated. Helvering v. Southwest Consolidated Corp., * * * [315 U. S. 194] differs to that extent that there the money was furnished by a third person as part of a loan transaction in which the acquiring corporation was the debtor so that it was the same as if the latter had made the payment itself.

While the *Hoboken* case differs from the instant case in that a stockholders' rather than a creditors' reorganization was involved, this difference is not material. What is important is that in both cases the funds used to purchase the interests of the nonparticipating propri-

etary owners came from a source other than the acquiring corporation and that the acquiring corporation owed no obligation to repay the amounts advanced.

As a bulwark to our holding, one additional fact not contained in the quoted summary should be mentioned. This fact is that on the date of the foreclosure sale the receiver of the old corporation had on hand a sum in excess of $95,000. In several cases we have held that the "solely for * * * voting stock" requirement of the applicable statutory provision is satisfied where on the date of the foreclosure action the old corporation had on hand sufficient funds to purchase the interests of the nonparticipating proprietary owners and those funds were either used for that purpose, *Southland Ice Co.*, 5 T. C. 842, *Westfir Lumber Co.*, 7 T. C. 1014, or could have been used for that purpose, *Roosevelt Hotel Co.*, 13 T. C. 399. Since the bondholders committee in the instant case could have chosen to pay off the nonparticipating bondholders by means of a payment from the old corporation's receiver and yet remain within the statutory language, it would seem an unnecessarily harsh extension of the form-versus-substance rule to hold that because the bondholders committee chose an equally desirous way of accomplishing the same result, petitioner should be penalized for its choice.

3. Was the requisite "continuity of interest" between the old corporation and petitioner preserved in the corporate reorganization? Our answer to this question is once again in the affirmative.

In the earlier *San Antonio Transit Company* case, *supra*, the Court of Appeals, in its opinion, made the following statement:

We do not base our conclusion here on any calculation of the percentage of the old corporation's property transferred to the taxpayer. Nor do we hold that it is necessary for all or any particular number of the old creditors to become stockholders in the new corporation. We simply hold that in this case, where the taxpayer acquired what amounts to only one property of a substantial enterprise as a result of proceedings and activities completely separate from all other property and from the claims of all other creditors, the necessary continuity of interest is not shown. Under no reasonable view can it be said that the old corporation has emerged as substantially the same enterprise in new form or that substantially all of its property was transferred to the new corporation.

Respondent contends that identical "continuity of interest" factors apply in respect of corporate reorganizations pursuant to section 112 (b) (10) of the Internal Revenue Code of 1939 (compare Regulations 111, section 29.112 (b) (10)–1, with Regulations 111, section 29.112 (g)–1), and that for this reason the holding in the earlier case should be followed here. He urges that the exchange transaction was not a tax-free reorganization because there was no continuance of the old corporation in new form, and because the persons who were the owners of the enterprise prior to the reorganization did not main-

tain a continuing interest in petitioner following the corporate reorganization.

Petitioner contends that the language "substantially all the properties of another corporation" appearing in section 112 (g) (1) (B) of the Revenue Act of 1936 was essential to the Court of Appeals holding in the earlier *San Antonio Transit Company* case, *supra*, and that the absence of such language in section 112 (b) (10) precludes any application of the holding of that case to the taxable year involved here.

Petitioner does not dispute the proposition that a "continuity of interest" test is applicable to section 112 (b) (10) reorganizations, *Chicago Stadium Corporation*, 13 T. C. 889, but contends that it is a different continuity of interest test than that which is applied to corporate reorganizations pursuant to section 112 (b) (4) and section 112 (g) (1) (B) of the Revenue Act of 1936.[5] In this regard petitioner urges that one of the major reasons for the enactment of section 112 (b) (10) was to relieve certain corporate exchanges from the rigid requirements of qualifying as a "reorganization" under the definition of that term as it appears in section 112 (g).

In resolving this issue it is important to understand that the "continuity of interest" rule has not remained constant. Instead, the nature and extent of the qualifying characteristics have been varied greatly depending upon the type of corporate exchange involved and the extent to which requirements have been codified by legislative enactments. For instance, a much stricter continuity of interest test, one requiring an exchange "solely" for "voting stock," applied to unifying reorganizations as the result of the enactment of section 112 (g) of the Revenue Act of 1934. Cf. *Helvering* v. *Southwest Corp.*, 315 U. S. 194.

Section 112 (g) (1) (B) of the Revenue Act of 1936, the applicable "reorganization" definitional section involved in the earlier *San Antonio Transit Company* case, *supra*, appears in footnote 5. This section requires that the acquisition be in exchange "solely for all or a part of * * * [the acquiring corporation's] voting stock"

---

[5] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(4) SAME—GAIN OF CORPORATION.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(g) DEFINITION OF REORGANIZATION.—As used in this section (other than subsection (b)(10) and subsection (1)) and in section 113 (other than subsection (a)(22))—

(1) The term "reorganization" means * * * (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, * * * or of substantially all the properties of another corporation. * * *

and that the acquiring corporation acquire "substantially all the properties of" the acquired corporation.

In the majority opinion in the earlier *San Antonio Transit Company* case, *supra*, the Court of Appeals places emphasis on a comparison of the corporate enterprise and corporate proprietors as they existed on the date receivership proceedings were begun, and the corporate enterprise and corporate proprietors as they later existed on the date the corporate reorganization was completed. This comparison led the majority of the Court of Appeals to conclude that the continuity of interest rule had not been met because the petitioner had "acquired what amounts to only one property of a substantial enterprise as a result of proceedings and activities completely separate from all other property and from the claims of all other creditors. *San Antonio Transit Company*, *supra* at 155.

While we do not object to a comparison of the corporate enterprise as at different dates for the purpose of determining whether there has been a transfer of "substantially all the properties of another corporation," we do not think that this comparison would be proper in the absence of some equivalent language in the statute. Thus, the implication to be drawn from such cases as *Pinellas Ice Co.* v. *Commissioner*, 287 U. S. 462, and *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378, is that the comparison for "continuity of interest" purposes is one of the corporate enterprises and corporate proprietors as they exist immediately before the corporate reorganization and the equivalent corporate enterprises and corporate proprietors as they exist immediately following the corporate reorganization. Applying this comparison to the facts of the instant case it is clear that petitioner acquired all of the remaining properties of the old corporation and that 91 per cent of those bondholders possessing effective interests in the remaining properties of the old corporation received 100 per cent of petitioner's stock in exchange for the transfer to it of these properties. We observe also that the mortgages on the old corporation's other properties were all in existence when the trustees in the Tower building deed of trust first commenced proceedings.

It is evident from the comparison which we have chosen to accept that we do not believe that the interpretation of *Helvering* v. *Limestone Co.*, 315 U. S. 179, contained in the majority opinion of the earlier *San Antonio Transit Company* case, *supra*, is applicable to section 112 (b) (10), for which purpose we regard the *Limestone* case, *supra*, as holding no more than that continuity of interest is preserved notwithstanding the elimination of an insolvent corporation's stockholders since the creditors of the insolvent corporation, by invoking their rights under the full priority rule of *Northern Pacific*

*Ry.* v. *Boyd*, 228 U. S. 482, step into the shoes of the stockholders and become equity holders. The fact that this transformation occurs no later than the time that steps are taken to enforce the right of full priority does not mean that for purposes of "continuity of interest" the same properties and proprietary owners must exist at the later date of the corporate reorganization,[6] especially when the "other properties" have been lost through no action or fault of these proprietary owners.

For example, it is common in a "D" type corporate reorganization (sec. 112 (g) (1) (D), I. R. C. 1939)[7] for "continuity of interest" to be found even though only a .part of the original properties is transferred to a new corporation. See *Estate of John B. Lewis*, 10 T. C. 1080, affd. 176 F. 2d 646; and *Reilly Oil Co.*, 13 T. C. 919, affd. 189 F. 2d 382.

In this regard, we note also that in *Western Massachusetts Theatres, Inc.* v. *Commissioner*, 236 F. 2d 186 (C. A. 1, 1956), reversing 24 T. C. 331, primarily on a continuity of *proprietary* interest issue, the respondent made some point of the fact that only about 25 per cent of the assets of Olympia had been transferred to the new corporation. On appeal the respondent abandoned this argument, "quite correctly" in view of the Court of Appeals decision in *Lewis* v. *Commissioner*, 176 F. 2d 646 (C. A. 1, 1949).

From what has been said above, we think that the holding of the earlier *San Antonio Transit Company* case, *supra*, should not be extended to cover corporate reorganizations falling under section 112 (b) (10). Because of this, and also because section 112 (b) (10) was enacted as a "relief" measure (see S. Rept. No. 627, 78th Cong., 1st Sess., p. 22), we hold that the continuity of interest test applicable to section 112 (b) (10) corporate reorganizations has been satisfied and that petitioner is entitled to apply section 113 (a) (22) in determining its depreciation allowance, gain or loss, and equity invested capital.

*Decisions will be entered under Rule 50.*

---

[6] One of the reasons given by the President of the United States for his veto of the Revenue Act of 1943, which veto was subsequently overridden, was that "This privilege [the nonrecognition privilege of section 112 (b) (10)] inures to the benefit of bondholders who, in many cases, have purchased their bonds in the speculative market for far less than their face value. It may open the door to further windfall profits in this market because of the undeserved benefit received by reorganized corporations." President's Veto Message, 90 Cong. Rec. 1959 (1944). See also: Fahey, " 'Relief' Provisions in the Revenue Act of 1943," 53 Yale L. J. 459; Darrell, "Creditors' Reorganizations and the Federal Income Tax," 57 Harv. L. Rev. 1009.

[7] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(g) DEFINITION OF REORGANIZATION.— * * *

(1) The term "reorganization" means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, * * *