## CENTRAL KANSAS TELEPHONE CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2839.

Circuit Court of Appeals, Tenth Circuit.

March 2, 1944.

Rehearing Denied April 17, 1944.

M. F. Cosgrove, of Topeka, Kans., for petitioner.

Helen Goodner, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, and J. Louis Monarch, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition to review a decision of the Tax Court of the United States.

The question presented is whether depreciable assets acquired by the Central Kansas Telephone Company, Inc.,[1] were acquired in a nontaxable reorganization as defined by § 112(g) (1) of the Revenue Act of 1936, as amended, or in a nontaxable exchange as defined in § 112(b) (5), of such Act as amended,[2] so that it is entitled to use as its basis for the depreciation of such assets the basis of its transferor.

The Kansas Telephone Company[3] was a corporation organized in 1928, under the laws of Kansas. It acquired a number of telephone exchanges and equipment, in payment for which it issued its promissory notes due May 1, 1929, in the amount of $850,000.

Prior to May 1, 1929, the old company issued and sold to the public, first mortgage six per cent, gold bonds totaling $550,000

[1] Hereinafter called the new company.

[2] Section 112(g) (1) of the Revenue Act of 1936, as amended by the Revenue Act of 1939, in part, reads:

"(1) The term 'reorganization' means * * * (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded; * * *." 26 U.S. C.A. Int.Rev.Acts page 858.

Section 112(b) (5) of the Revenue Act of 1936, as amended, in part, reads:

"No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under section 213 of the Revenue Act of 1939 it is not considered as 'other property or money') shall be considered as stock or securities received by such transferor." 26 U.S.C.A. Int.Rev.Acts, page 856.

[3] Hereinafter called the old company.

and a new issue of promissory notes totaling $475,000. The proceeds from the sale of bonds and new notes were used to retire the first issue of notes. Subsequently, it issued and sold to the public additional six per cent first mortgage bonds totaling $70,500.

Early in 1932 it was disclosed that the income of the old company was insufficient to meet its operating expenses. On February 17, 1932, a petition was filed in the United States District Court for the District of Kansas for the appointment of receivers for the old company. Receivers were appointed on February 27, 1932. The old company defaulted on the installment of interest due April 15, 1932. On June 15, 1932, a proceeding was instituted in such court to foreclose the mortgage. The receivership proceeding and foreclosure proceeding were consolidated. A decree of foreclosure was entered August 24, 1934. It awarded judgment against the old company for $725,795.51, the amount of principal and interest due on the bonds, and ordered its property sold at foreclosure sale.

A bondholders' protective committee[4] was formed on September 15, 1932.

On October 5, 1937, pursuant to the decree of foreclosure, the assets of the old company were sold at public auction and were bid in by the committee for $310,000. At the time of the foreclosure sale, the committee had on deposit with it, 90 per cent of the issued and outstanding bonds of the old company.

The committee submitted a plan of reorganization, dated December 15, 1932, under which it was proposed that a new corporation be formed to purchase all of the assets held by the committee. The plan of reorganization was approved by the federal court. On January 19, 1938, the new company was organized under the laws of Kansas pursuant to the plan of reorganization. All of its voting stock amounting to $450,000 was issued to the bondholders in exchange for all of the assets of the old company and the assumption of all of the obligations of the committee. Under the plan, all the voting stock was to be held by voting trustees until January 1, 1943. The stock was delivered to the voting trustees. The depositing bondholders received certificates of beneficial interest in the stock in proportion to the number of bonds owned by them. The owners of approximately 10 per cent of the outstanding bonds of the old company declined to participate in the reorganization. Pursuant to the plan of reorganization, the new company paid to the special master, appointed to sell and convey the property, for disbursement to the nondepositing bondholders $22,470.34, which was approximately 50 per cent of their claims. The new company borrowed the funds with which to make such payment and later repaid the loan. It also paid $7,691.14, expenses of the committee, and a receivers' claim of $622.98.

It was stipulated that the fair market value of the assets acquired by the new company at the time of its organization was $450,000 and that in the event such assets were acquired through a taxable reorganization or a taxable exchange, the proper basis for depreciation of such assets on January 1, 1938, was $394,117.60, and that in the event such assets were acquired through a nontaxable reorganization or a nontaxable exchange, the proper basis for depreciation of such assets on January 1, 1938, was $868,372.04, and that the reserve for accrued depreciation on that date was $368,263.54, and the unrecovered basis was $500,108.50.

The Tax Court held that the new company did not acquire the assets of the old company in a nontaxable reorganization or in a nontaxable exchange, and was not entitled to use the basis of the old company for depreciation of its assets.

The new company, pursuant to the plan of reorganization, acquired the assets of the old company, which had been bid in by the committee at the foreclosure sale, in exchange for voting stock of the new company and cash and the assumption by the new company of the liabilities of the committee. The assets of the old company were acquired by the new company in exchange for the latter's stock and cash. They were not acquired solely in exchange for voting stock unless the cash was paid in discharge of a liability of the old company assumed by the new company or unless the new company acquired the property subject to a liability of the old company and the cash was paid in discharge of that liability.

A like question was considered by the court in Helvering v. Southwest Corp., 315 U.S. 194, 62 S.Ct. 546, 550, 86 L.Ed. 789. There the old corporation defaulted in its

---

4 Hereinafter called the committee.

mortgage bonds. A bondholders' committee was formed. Eighty-five per cent of the outstanding bonds were deposited with the committee pursuant to a plan of reorganization. The assets securing the bonds were sold at foreclosure sale in 1934 and were bid in by the committee at a price substantially below their fair market value. A new corporation was organized. The assets held by the committee were transferred to it. Nonparticipating security holders owning $440,000 face amount of obligations received about $106,680 in cash. The cash was obtained by a loan from a bank. That loan was assumed by the new corporation.

In the opinion the court said:

"Security holders of the old company (corporation) owning $440,000 face amount of obligations were paid off in cash. That cash was raised, during the reorganization, on a loan from a bank. Since that loan was assumed by respondent, it is argued that the requirement of clause (B), as amended in 1939, was satisfied. But, in substance, the transaction was precisely the same as if respondent had paid cash plus voting stock for the properties. We search the legislative history of the 1939 amendment in vain for any indication that it was designed to do more than to alter the rule of the Hendler case. That case dealt with a situation where an indebtedness which antedated the transaction in question was assumed by the transferee. There the debt assumed clearly was a 'liability of the other' corporation. The situation here is quite different. The rights of the security holders against the old corporation were drastically altered by the sale made pursuant to the plan. The sale not only removed the lien from the property and altered the rights of the security holders in it; it also limited and defined the rights of the individual creditors if they elected to take cash rather than participate in the plan. See Weiner, Conflicting Functions of the Upset Price, 27 Col.L.Rev. 132, 137–138. In Helvering v. Alabama Asphaltic Limestone Co., supra [315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775], we regarded the several steps in a reorganization as mere 'intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan.' Under that approach, part of the consideration which respondent paid for the properties of its predecessor was cash in the amount of about $106,680. The fact that it was paid to the bank, rather than to the old corporation or its creditors, is immaterial. The requirement to pay cash arose out of the reorganization itself. It derived, as did the requirement to pay stock, from the plan pursuant to which the properties were acquired. It was a necessary incident of the court decree which wiped out the liability of the old corporation and substituted another one in its place. Though the liability assumed had its origin in obligations of the transferor, its nature and amount were determined and fixed in the reorganization. It therefore cannot be labelled as an obligation of the 'other' or predecessor corporation within the meaning of the 1939 amendment. Nor can the property be said to have been acquired 'subject to' that liability within the purview of that amendment. The words 'subject to' normally connote, in legal parlance, an absence of personal obligation. That seems to be the case here, for the preceding clause of the amendment covers the case of 'assumption'."

Here, the new company, pursuant to the plan of reorganization, paid $22,470.34 in cash to the Special Master appointed to sell and convey the assets. Pursuant to the plan, the new company acquired the assets in exchange for its stock and cash. On authority of Helvering v. Southwest Corp., supra, we hold that, while the obligation to pay the cash had its origin in obligations of the old company to the nondepositing bondholders, its nature and amount were determined and fixed in the reorganization and that the new company, in agreeing to pay such cash, did not assume an obligation of the old company or acquire the assets subject to a liability of the old company within the meaning of the statutes referred to above.

Affirmed.