**STOCKTON HARBOR INDUSTRIAL COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 13615.

United States Court of Appeals Ninth Circuit.

Nov. 1, 1954.

Rehearing Denied Dec. 1, 1954.

Chambers, Circuit Judge, dissented in part.

Valentine Brookes, Arthur H. Kent, San Francisco, Cal., for appellant.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Melva M. Graney, Sp. Assts. to Atty. Gen., Charles W. Davis, Chief Counsel, Bureau of Internal Revenue, Washington, D. C., for appellee.

Before ORR and CHAMBERS, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

We are called upon to review a decision of the Tax Court of the United States. The main question before us is whether the petitioner, to whom we, shall refer as the taxpayer, acquired its property in a reorganization and whether the money derived from a condemnation of land by the United States Government resulted in a capital gain.

## I

### The Scope of Review

The taxpayer filed its tax return on the assumption that the basis of the land for computing its tax liability in 1944 and 1945 was its cost to it, amounting to $380,000.00 and that the gain from the sale of the condemnation of the land was capital gain. The Commissioner disallowed both contentions in his deficiency letters and his action was sustained by the Tax Court, which found:

> "That there are deficiencies in income tax for the years 1944 and 1945 in the respective amounts of $2,484.57 and $840.13; that for such years there are deficiencies in declared value excess profits tax in the respective amounts of $317.01 and $39,639.50; and that for such years there are deficiencies in excess profits tax in the respective amounts of $1,884.50 and $220,935.95."

This is a petition to review the decision. Under the provisions of the Internal Revenue Code the scope of our review, except as provided in 28 U.S.C. § 1254, with which we are not concerned here, is stated to be:

> "* * * in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury". 26 U.S.C., § 1141.

In applying this provision, this court and other courts have held that it is not our function to retry questions of fact determined by the trial court upon conflicting evidence or even upon uncontradicted evidence where different inferences may reasonably be drawn from them. Grace Bros. v. Commissioner of Internal Revenue, 9 Cir., 1949, 173 F.2d 170, 173-174; Rider v. Commissioner of Internal Revenue, 8 Cir., 200 F.2d 524; Wisdom v. United States, 9 Cir., 1953, 205 F.2d 30, 33; R. P. Farnsworth & Co. v. Commissioner of Internal Revenue, 5 Cir., 1953, 203 F.2d 490.

The Court of Appeals for the Eighth Circuit has summed up the limitations of the scope of this review in these words:

> "It is not the province of this court to retry the issues that were presented to the Tax Court. It was the province of that court to determine the facts." Rider v. Commissioner of Internal Revenue, supra, 200 F.2d at page 525.

These cases are in line with the statement of the Supreme Court that the Tax Court

> "is the agency designated by law to find and examine the facts and to draw conclusions as to whether a particular assignment left the assignor with substantial control over the assigned property or the income which accrues to the assignee. And it is well established that its decision is to be respected on appeal if firmly grounded in the evidence and if consistent with the law." Commissioner of Internal Revenue v. Sunnen, 1948, 333 U.S. 591, 607, 68 S.Ct. 715, 724, 92 L.Ed. 898.[1]

1. (Author's Note.) The language just quoted was used before the 1948 amendment to 26 U.S.C. § 1141(a) which gave to the findings of the Tax Court the same force as those of the decisions of District Courts in civil cases tried without a jury. But, in essence, it states the law as it is today. For whatever change the amendment may have intended in the attitude of reviewing courts towards the findings of the Tax Court, the principle that the findings of the Tax Court based on contradictory evidence will be respected, still obtains, *as it did before*. Indeed, this appears from the decisions of the Courts of Appeals cited in the text, all of which were decided since the change. And see, Builders Steel Co. v. Commissioner of Internal Reve-

## II

### The Basic Facts

The basic facts as found by the Tax Court are these. The taxpayer, a California corporation, was incorporated on October 16, 1936. Ten days later it acquired certain assets of Lindley Patrick Farms, Inc., (to be referred to as Lindley Patrick) a California corporation of which Albert Lindley was president, director and sole stockholder. His wife was the other director.

Between the years 1912 and 1926 Albert Lindley purchased various parcels of land totaling approximately 1,150 acres on an adjoining Rough and Ready Island, which is situated in the delta of the San Joaquin River near Stockton. The Stockton Deep Water Channel runs along the island's northern boundary to the Port of Stockton. Lindley purchased the lands for the purpose of holding them for appreciation in value which he expected would result from public improvements for navigation, with the thought that, while awaiting such developments, he could farm the land and thereby receive income or rentals.

Upon the organization of Lindley Patrick, Lindley transferred 1,110 acres of land to the corporation in exchange for all of its stock. The corporation was organized for the purpose of farming, working, developing and otherwise dealing with the properties acquired.

In 1930, further improvements for navigation were planned by public authority and were later made. The Belt Line Railroad was proposed and constructed at approximately the same time. It was about that time that a demand arose for parcels of the property for waterfront and industrial uses. Lindley Patrick undertook to sell its lands in parcels for such purposes.

By October 1, 1936, approximately 200 acres had been sold, but Lindley Patrick was in financial difficulties because of inability to pay $25,655.77 back taxes and mortgage interest. It was indebted to the San Francisco Bank in the amount of $79,000.00, secured by a deed of trust, and to the Stockton Savings and Loan Bank in the amount of $45,595.65 and to L. F. Grimsley, Inc., in the amount of $3,557.97, both secured by a single second deed of trust. Interest on these debts had not been paid for several years, and by October 1, 1936, totaled about $20,500.00. In addition, the property was subject to liens for delinquent county taxes in the amount of $3,767.36.

On October 6, 1936, Lindley Patrick gave Stuart L. Rawlings a written option "to purchase" its assets, the terms of which (as amended by an addendum dated October 8, 1936) were as follows:

(a) A new corporation was to be formed for the purpose of "holding, operating and selling" the real property, with a board of directors of three members, one of whom was to be Albert Lindley.

(b) "The purchase price" of the property was "to be paid" by the delivery to Lindley Patrick of 49 per cent of the new corporation's stock, subject to the payment of the principal sum of the above-mentioned promissory notes and accrued interest thereon.

(c) Rawlings was to pay to the new corporation the sum of $30,000.00 and receive 51 per cent of its stock.

nue, 8 Cir., 1952, 197 F.2d 263, 264; Gillette's Estate v. Commissioner of Internal Revenue, 9 Cir., 1950, 182 F.2d 1010, 1014; National Brass Works, Inc., v. Commissioner of Internal Revenue, 9 Cir., 1953, 205 F.2d 104, 107.

Of course, where the facts *are not in dispute* and wrong legal conclusions are attached to them, the reviewing court is not bound to respect the erroneous conclusions, but can draw different and correct ones of its own. Hypotheek Land Co. v. Commissioner of Internal Revenue, 9 Cir., 1952, 200 F.2d 390, 392: Gensinger v. Commissioner of Internal Revenue, 9 Cir., 1953, 208 F.2d 576. 583; McGah v. Commissioner, 9 Cir., 1954, 210 F.2d 769, 771. So the gloss stated in the quotation from Commissioner of Internal Revenue v. Sunnen, supra, has continuity.

(d) The $30,000.00 was to be used by the new corporation to pay the delinquent taxes and the overdue interest, and any balance was to remain in the treasury of the new corporation.

(e) Rawlings was to lend $20,000.00 to Lindley Patrick, to be secured by the pledge of its 49 per cent of the stock in the new corporation.

On October 15, 1936, the Stockton Savings and Loan Bank (which held promissory notes of Lindley Patrick on which there was a balance due of $45,495.65 secured by a second trust) bought from the San Francisco Bank its entire interest in the first deed of trust for the face amount of the principal ($79,000) and overdue interest, plus one dollar for a release. E. L. Wilhoit was at that time president of the Stockton Savings and Loan Bank and is now chairman of its board of directors.

On October 16, 1936, the taxpayer was incorporated by E. L. Wilhoit, R. L. Eberhardt and Stuart L. Rawlings, each receiving one $50 share of stock. Taxpayer had a capital stock of $60,000 divided into 1,200 shares of a par value of $50 each, all of which was common stock. Its stated powers and purposes were, among other things, "to acquire, own, subdivide, develop, improve, buy, sell, lease * * * all kinds of land and personal property; * * * to transact any other kind of business that may be beneficial and desirable for the stockholders."

On October 22, 1936, the directors of Lindley Patrick resolved to deed the real property to the taxpayer, subject to the principal amount of the encumbrances, and to transfer to taxpayer a related obligation of the City of Stockton and five promissory notes made by Grant B. Shipley to Lindley Patrick, hereinafter referred to as the Shipley notes. The resolution stated "the consideration therefor to this corporation to be the sum of approximately $25,655.77 in cash, and five hundred ninety-nine (599) shares of the capital stock of" taxpayer.

Two days later, on October 24, 1936, the taxpayer's board of directors adopted a resolution to acquire from Lindley Patrick all the real property, the related obligation of the City of Stockton and the Shipley notes. The real property was to be acquired subject to the deeds of trust securing the principal of the notes, and to the second installment of the current realty taxes. The resolution also provided that "The consideration to be paid therefor by this corporation to the said Lindley Patrick Farms, Inc., is the sum of $25,655.77 and the issuance by this corporation to Lindley Patrick Farms, Inc., of 599 shares of the capital stock of this corporation."

On the same day, October 24, 1936, the taxpayer's board of directors, also by resolution, instructed its officers to apply to the State Corporation Commission for a permit to issue additional shares of stock, for the following named considerations

E. L. Wilhoit—259 shares for $12,950

Stuart L. Rawlings—239 shares for $11,950

William Wallace Mein—100 shares for $5,000

Lindley Patrick Farms, Inc.—599 shares, for the transfer of the property subject to the encumbrances described above.

The resolution also recited that "in addition to the said 599 shares of the capital stock of this corporation, there is to be paid to the Lindley Patrick Farms, Inc., the sum of $25,655.77."

On October 22, 1936, two days prior to the date of the above resolution, taxpayer filed with the Corporation Commissioner its application for a permit to issue stock. This application stated, inter alia, that stock was to be issued for cash to the individuals above named in the total of 601 shares and that the corporation was to acquire from Lindley Patrick certain of its assets; that the 902 acres of land to be acquired from Lindley Patrick had been appraised at the sum of $418,000; "that said property is to be acquired subject to the payment of the principal sum of secured indebtedness, the total amount of which is

the sum of $218,153.62", and which indebtedness was secured by five separate deeds of trust; "that the consideration to be paid by this corporation for said real and personal property is the sum of $25,655.77 and 599 shares of the capital stock of this corporation"; and "that this corporation has been formed and organized primarily for the purpose of acquiring and dealing in real estate of all kinds, and of improving, subdividing, and selling the same".

The taxpayer's officers were designated and described in the application. E. L. Wilhoit was designated as president. It was stated that for more than 25 years, he had been engaged in buying and selling real estate and that at the time was president of the Stockton Savings and Loan Bank, of Stockton, a capacity in which he had served for many years. Stuart L. Rawlings, who was shown as having been actively engaged in selling and buying real estate and as being associated with a cement company, an oil company and other corporations at that time, was designated as executive vice president. Albert Lindley was shown as vice president and general manager. It was stated that for many years he had owned real estate situated at San Joaquin County and that he had operated his properties as farming lands, had subdivided and sold portions for industrial purposes, and was thoroughly acquainted with the real property to be acquired by the taxpayer. Freda Keser, who was shown at that time to be secretary to Wilhoit, was designated as secretary and treasurer. She was described as an experienced secretary and accountant.

The permit was issued October 23, 1936. It authorized the taxpayer to issue 599 shares of its stock to Lindley Patrick Farms, Inc., for "the property and assets described in its application * * * subject to liabilities and encumbrances not exceeding in the aggregate $153,809.39". It also authorized the taxpayer to issue "601 shares to the persons named in its application at par for cash". Upon receipt of this permit,

the taxpayer issued 599 shares of its stock in the name of Lindley Patrick Farms, Inc., and 601 shares to individuals of the Rawlings group.

On October 24, 1936, Lindley Patrick wrote a letter of instructions to the Security Title Insurance and Guarantee Company, the escrow agent, and transmitted with it the deed to the 902 acres of real property, the assignments to the Shipley notes and to the Stockton obligation, and also a $20,000 demand note executed by it and made payable to Stuart L. Rawlings, with a pledge agreement hypothecating its stock in the taxpayer as security for the note. In the letter, it was stated:

"6. There will be handed to you for the account of the undersigned by Stockton Harbor Industrial Company the sum of $25,655.77, which said sum is to be disbursed by you in the following manner, to-wit:

| | |
|---|---:|
| " 'Stockton Savings & Loan Bank—Interest on $79,-000.00 note | $14,357.81 |
| Stockton Savings & Loan Bank—Interest on $100.00 note and $45,495.65 note | 6,156.47 |
| L. F. Grimsley, Inc.—Interest on notes totaling $3,557.-97 | 798.87 |
| Redemption from Tax Sales | 3,767.36 |
| First Installment of State and County Taxes for 1936-1937 | 575.26 |
| | $25,655.77' |

All interest to be paid by October 24, 1936. After payment of the above amounts, any surplus remaining is to be paid by you to the Stockton Harbor Industrial Company.

"There will also be handed to you for the account of the undersigned, certificate or certificates for 488 shares of the capital stock of the Stockton Harbor Industrial Company, this stock to be issued in the name of Lindley Patrick Farms, Inc., Stuart L. Rawlings, pledgee.

"The deed numbered 1, assignment numbered 2, and assignment numbered 3, are to be delivered to the Stockton Harbor Industrial Company, upon the payment of the money, and the delivery of the stock as hereinabove set forth, and thereupon you are authorized to deliver the said stock in pledge, the said promissory note, and said pledge agreement, upon the said certificate of stock being properly endorsed, upon their being delivered to you, for the account of undersigned, of the sum of $20,000.00.

"Deliveries herein authorized are to be made only at the consummation of one transaction, including the conveyance of the property and the issuance of the stock, and the pledge thereof, in accordance with the terms hereinabove set forth.

"The President of the corporation is authorized to make such changes in the foregoing instructions as may be necessary to accomplish the purposes and objects thereof."

The letter was signed by Albert Lindley, as president of Lindley Patrick Farms, Inc. At the foot of the instructions is a statement, dated October 24, 1936, and signed by the taxpayer through its president, E. L. Wilhoit, as follows:

"We hand you herewith the sum of $25,655.77 which you are directed to use in accordance with the foregoing instructions, which we approve, provided nothing has transpired affecting the property subject to this escrow, since your report No. 68832 of date of October 20, 1936. We also deliver you herewith Certificate No. 8, and Certificate No. 11 for 587 and 1 share, respectively, Stockton Harbor Industrial Company Stock for delivery to Lindley Patrick Farms, Inc."

The contemplated acts to be performed by the escrow agent were carried out in accordance with the instructions received.

Lindley Patrick reported and deducted a loss from this transaction in its 1936 income tax return. The return was not audited and the claimed deduction was accordingly not disallowed.

Lindley Patrick was not dissolved prior to 1942.

At the time the taxpayer acquired "the approximately 902 acres of land" from Lindley Patrick, the land had a fair market value of $380,000. The values of the other assets acquired were as follows:

"Shipley notes—5 at $2,500. . $12,500.00
Accrued interest on Shipley notes, August 5, 1936 to October 22, 1936, about... 162.50
Amount due from City of Stockton, .............. 4,188.00
Accrued interest on amount due from City of Stockton .................. 775.74
                                    $17,626.24"

The taxpayer acquired the real property for the purpose of developing and selling it as industrial property. It was adjacent to the Port of Stockton and gas for commercial use was available from wells approximately four miles away.

### III

#### Was There a Tax-Free "Reorganization"?

On the basis of the above facts and others to be referred to further on in the decision, the Tax Court held that (1) the exchange of the taxpayer's stock for the assets of Lindley Patrick was a "reorganization" within the meaning of Section 112(g) (1) (C) of the Internal Revenue Code, with the result that, pursuant to Section 113(a) (7), the taxpayer's basis for the real property received was the same as that of its transferor and that (2) the real property was held primarily for sale to customers in the ordinary course of business within the meaning of Section 117(j) (1) (B), with the result that the taxpayer's gain on the disposition of the real property is taxable as ordinary income rather than as capital gain.

It is the contention of the taxpayer that the real property was not acquired solely for stock. This is based upon the contention that in acquiring the property from Lindley Patrick, there was paid by them the sum of $25,655.77 in cash and that they assumed the unpaid indebtedness of Patrick on the property and as a condition a $20,000.00 loan was required to be made to Lindley Patrick by one of the taxpayer's shareholders. On the basis of this, it is argued that the consideration was the stock, the $25,655.77 in cash and the $20,000.00 loan.

Reorganization under the section involved means:

"* * * the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded". 26 U.S.C. § 112(g) (1) (B).

The last clause excluding the liabilities of the other corporation assumed by the transferee or liabilities to which the acquired property is subject, was added by the amendment of 1939 and was made retroactive to the act of 1934, 53 Stat. 871.

■ We eliminate at the start the $20,000.00 loan for that was not money paid in *exchange* for the voting stock. The only thing that can be considered as being involved in such exchange is money paid to the other party or for its benefit as consideration for the transfer. The only properties which can be considered are those exchanged,—*one for the other*. The $20,000.00 loan was a private trans-

action between one of the taxpayer's stockholders and Lindley Patrick. The money so paid was not assumed by the transferee, and while it went through the same escrow it cannot be considered a part of the transaction. In Commissioner of Internal Revenue v. Schumacher Wallboard Corp., 9 Cir., 1937, 93 F.2d 79, this Court said:

"The cost of an article to a person is what the person pays for the same." (At page 82.)

In the case of an exchange the cost is the property which goes from one to the other. The $20,000.00 loan was not a part of what the new corporation paid for the assets of its predecessor. Hoboken Land & Improvement Co. v. Commissioner, 3 Cir., 1943, 138 F.2d 104, 110.

■ There remains the question then whether the exchange was "solely" for stock under the wording of Section 112 (g) (1) (B), 26 U.S.C., so as to amount to a "reorganization". "Solely for" means "exclusively for". It "leaves no leeway". Helvering v. Southwest Consolidated Corp., 1942, 315 U.S. 194, 198, 62 S.Ct. 546, 550, 86 L.Ed. 789.

The clause was enacted in order to overcome the ruling of the Supreme Court in United States v. Hendler, 1938, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018. In that case there had been a merger or reorganization of the Borden Company and the Hendler Creamery Company, Inc. resulting in gains of over $6,000,000.00 to the Hendler Company.

Pursuant to a plan of reorganization the Borden Company assumed and paid $534,297.40 bonded indebtedness of the Hendler Company. Reversing the lower court which had held that because the Hendler Company did not actually receive the money with which the Borden Company discharged its indebtedness, Hendler's gain of $534,297.40 was not taxable, the court said:

"The transaction, however, under which the Borden Company *assumed* and paid the debt and obligation of the Hendler Company is to be re-

garded in substance as though the $534,297.40 had been paid directly to the Hendler Company. The Hendler Company was the beneficiary of the discharge of its indebtedness. *Its gain was as real and substantial as if the money had been paid it and then paid over by it to its creditors.* The discharge of liability by the payment of the Hendler Company's indebtedness constituted income to the Hendler Company and is to be treated as such." 303 U.S. at page 566, 58 S.Ct. at page 656. (Emphasis added.)

The Supreme Court in a subsequent case, Helvering v. Southwest Consolidated Corp., 1942, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789, stated distinctly that the amendment "was made to avoid the consequences of United States v. Hendler, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018." 315 U.S. at page 199, 62 S.Ct. at page 550. The Tax Court in the case before us was of the view that the sum of $25,655.77 paid by the taxpayer into the escrow at the time it acquired the assets of Lindley Patrick did not constitute an additional cash consideration paid *to Patrick by the taxpayer for the property*. The property acquired by the taxpayer was acquired subject to the payment of the principal sum of secured indebtedness, the total amount of which was the sum of $128,153.62. The existence of this indebtedness appeared in the escrow instructions and in the many other preliminary documents which formed a part of the transaction. The price to be paid for the property was given as "$25,655.77 and 599 shares of the capital stock of this corporation".

Concededly the sum of $25,655.77 was to be paid on the accrued interest on the indebtedness and unpaid taxes, as appears from the letter of instruction from Lindley Patrick dated October 24, 1936, already reproduced, which contained directions to the escrow agent as to the cash and its disposition.

It is the taxpayer's contention that the Tax Court was wrong in holding that because the money was disbursed to pay accumulated interest and unpaid taxes, it was not a cash payment to Lindley Patrick.

■ As the taxpayer and the Government seem to draw different conclusions from the few cases which have construed the clause introduced into section 112(g) (1) (B), 26 U.S.C. by the 1939 amendment, it will be necessary to analyze them in great detail in order to see them in true perspective. When this is done, it will be seen that only when a debt, although originating in the obligation of the transferor, is of such character that its nature and amount *are determined and fixed in the reorganization,* will the Courts disregard its liquidation by cash as a part of the reorganization. And conversely, when the nature and amount of a debt arising from a pre-existing obligation are determined and fixed prior to the reorganization, the payment of cash to liquidate it is treated as a payment on a liability assumed. In Helvering v. Southwest Consolidated Corp., supra, the indenture securing bonds of an insolvent corporation was foreclosed and its properties were transferred to a new corporation pursuant to a plan of reorganization evolved by the creditors, in exchange for common stock and stock purchase warrants of the new corporation. The common stock went mostly to bondholders of the old corporation. But a small portion of it, together with part of the warrants, went to the old corporation's participating unsecured creditors, the other warrants going to the old corporation's preferred and common stockholders. Its non-participating security holders *were paid cash,* which was obtained in the course of the transaction by means of a loan from a bank which the new corporation later assumed and paid. The Court held that the payment of cash to security holders who had declined to take the stock made the 1939 amendment inapplicable. The reason for the ruling is contained in the following paragraph:

"The requirement to *pay cash arose out of the reorganization itself. It derived,* as did the require-

*ment to pay stock, from the plan pursuant to which the properties were acquired. It was a necessary incident of the court decree which wiped out the liability of the old corporation and substituted another one in its place. Though the liability assumed had its origin in obligations of the transferor, its nature and amount were determined and fixed in the reorganization.* It therefore cannot be labelled as an obligation of the 'other' or predecessor corporation within the meaning of the 1939 amendment. Nor can the property be said to have been acquired 'subject to' that liability within the purview of that amendment. The words 'subject to' normally connote in legal parlance an absence of personal obligation. That seems to be the case here, for the preceding clause of the amendment covers the case of 'assumption'." 315 U.S. at page 200, 62 S.Ct. at page 550. (Emphasis added.)

In Central Kansas Telephone Co. v. Commissioner, 10 Cir., 1944, 141 F.2d 213, a new company, pursuant to reorganization, acquired the assets of an old company from a bondholders' committee for the voting stock of the old company. The sum of $22,470.34 cash was to be paid to a special master appointed to sell and convey the property and who was to use the money to satisfy the demands of the outstanding bondholders of the old company who had *declined to participate in the reorganization.* The new company borrowed the funds with which to make the payment and later repaid the loan. It also paid $7,690.14 as expenses of the committee and the receiver's claim of $622.98. The Court held that the payment of cash to liquidate the debt of the bondholders prevented the application of the section, that the debt arising from prior obligations only became determined and fixed in the reorganization as would also the expenses incurred in effecting the reorganization, saying:

"Here, the new company, pursuant to the plan of reorganization, paid $22,470.34 in cash to the Special Master appointed to sell and convey the assets. Pursuant to the plan, the new company acquired the assets in exchange for its stock and cash. On authority of Helvering v. Southwest Corp., supra, we hold that, *while the obligation to pay the cash had its origin in obligations* of the old company to the nondepositing bondholders, *its nature and amount were determined and fixed in the reorganization and that the new company, in agreeing to pay such cash, did not assume an obligation of the old company or acquire the assets subject to a liability of the old company within the meaning of the statutes referred to above.*" 141 F.2d at page 215. (Emphasis added.)

A like ruling was made in Adwood Corp. v. Commissioner, 6 Cir., 1952, 200 F.2d 552. The taxpayer seems to find in some of the language in this opinion relating to payments to "a creditor in its own right" (at page 555) an intimation that the payment of a pre-existing debt in cash, if achieved in the process of reorganization, is a cash payment whether the obligation originated in the reorganization or not. It will, therefore, be necessary to go, with some detail, into the factual background of the case. For the statements of the opinion must be read against it.

Harry L. Pierson and Harriet P. Taylor, who are referred to as the Piersons, owned property in Detroit which they leased for ninety-nine years to Ray Spitzler and Paul L. Kamper, the lessees agreeing to build a hotel building on it. On October 20, 1925, the lessees assigned to a corporation known as the Savoy Hotel Company. Savoy and the Piersons later executed a trust indenture to secure first mortgage bonds in the principal sum of $1,450,000.00. The lease provided that upon default, the Piersons could, after notice and the lapse of three months, declare the lease termi-

nated, in which event they could take possession and all improvements on the property would belong to them. The trust indenture provided that upon default in carrying out the terms of the mortgage, the trustee could, by a thirty-day notice to Savoy and the Piersons, declare the principal of the mortgage due immediately.

There were several defaults by Savoy. The Piersons served notice and took possession of the premises on January 6, 1930. In the litigation which ensued over the possession the State courts confirmed the title of the Piersons.

A bondholders' committee was formed which began negotiations with the Piersons concerning a possible reorganization. On May 20, 1930, the trustee served notice on Savoy and the Piersons declaring the principal of all bonds payable immediately, and began foreclosure proceedings in June, 1930. A decree was entered on October 26, 1931, authorizing a sale of the premises forthwith unless the debt was paid. There being no adequate bid at the time the sale was continued and finally made on June 11, 1941. The property was, in the meantime, operated by the Piersons, later by the Trustee, and then by a hotel management company and the Trustee and the Piersons advanced large sums for taxes and operating expenses which became liens on the mortgaged premises prior to the lien of the first mortgage. Ten years after the foreclosure, a plan of reorganization was developed by the bondholders' committee in conjunction with the Piersons and the Trustee which was approved by the Public Trust Commission on April 18, 1941. It provided for the organization of a corporation which was to purchase the property at the foreclosure sale for the benefit of the bondholders. The trustee agreed to accept $110,000.00 in settlement of its advances and to surrender for cancellation $50,000.00 face amount of first mortgage bonds which it owned. The Piersons agreed to accept in satisfaction of their advances $65,000.00 and 2700 shares of the petitioner's stock. A deed

to the hotel property was finally delivered to the petitioner, who borrowed $200,000.00 on a mortgage and paid the Trust Company and the Piersons. The holders of $6500.00 of the total bonds outstanding objecting to the plan, were paid in cash. The Tax Court found that the property was not acquired by the petitioner as a part of a reorganization. Upholding this view, the Court of Appeals for the Sixth Circuit held that the payments to the Piersons and the Trust Company were cash payments, saying:

"Moreover, the exchange here was not only for voting stock but also for cash paid to the Piersons and the Detroit Trust Company, a creditor in its own right, as well as trustee for bondholders. That section requires that the exchange be solely for voting stock, Helvering v. Southwest Consol. Corporation, 315 U.S. 194, 62 S.Ct. 546, 550, 86 L.Ed. 789, declares the term 'solely' to be significant and holds that the fact that cash is also paid takes the case outside the operation of the section.

"The petitioner claims, however, that the cash payments were pursuant to an assumption of liability of the predecessor corporation and, therefore, should be disregarded. But even were we to assume that Savoy was the transferor, *the nature and amount of the obligation was not determined and fixed until the plan of organization of the petitioner was adopted and put into effect by the agreement* between the bondholders, the Piersons and the Detroit Trust Company, Helvering v. Southwest Consol. Corporation, supra. There, the Court said, 'Though the liability assumed had its origin in obligations of the transferor, its nature and amount were determined and fixed in the reorganization.'" 200 F.2d at pages 555–556. (Emphasis added.)

█ So it is quite evident that this portion of the opinion read as a whole follows the gloss of the other cases in holding that cash paid on obligations,

the nature and amount of which is *determined only in the reorganization,* is additional consideration. And so, whether we are dealing with (1) stockholders or bondholders who do not consent to reorganization, (2) creditors who have unliquidated claims, the nature and extent of which were not definitely determined until the reorganization, or (3) debts incurred as expenses of reorganization, we are dealing with liabilities which, in the language of Helvering v. Southwest Consol. Corporation, supra, although they had their "origin in obligations of the transferor, [their] nature and amount were determined and fixed in the reorganization." 315 U.S. at page 200, 62 S.Ct. at page 550.

■ But here the cash paid into the escrow ($25,655.77) was applied to the payment of obligations of Lindley Patrick, the extent and amount of which *were fixed prior* to the reorganization. The interest he owed upon his indebtedness, he designated in his instructions to the escrow agent. The exact amount was given and the provision added "all interest to be paid on October 24, 1936". The amounts arrived at were the result of mathematical calculations based upon the amount of each indebtedness, the rate of interest and the period during which it remained unpaid. So the indebtedness as to interest was the liquidation of a debt the nature and extent of which was fixed prior to the reorganization. It *did not arise* in the reorganization. It was a pre-existing obligation which did not require the reorganization to acquire certainty. The same is also true of the taxes. The obligation to pay taxes existed by reason of the ownership of the property by Lindley Patrick. A part of it had been sold to the State. It was necessary, therefore, to redeem from the sale. Other taxes had accrued and had not been paid. Under the law of California, taxes on real property are liens against the property assessed. California Revenue and Taxation Code, § 2187. A tax on improvements is a lien on the land on which they are located if they are assessed to the same person to whom the land is assessed. Upon nonpayment of taxes and the publication of notice of delinquencies by the Tax Collector, the property is sold to the State by operation of law and the declaration of the Tax Collector. California Revenue and Taxation Code, § 3436. After the sale, the property passes to the State and may be redeemed by the payment of the delinquencies to the State. California Revenue and Taxation Code, § 3520 et seq. The escrow letter indicated that there was a lien on the property for the first installment of State and County taxes for the year 1936–1937 in the sum of $575.26, and that there was needed, to redeem property from tax sales, the sum of $3767.36. Clearly, then, the payment of taxes was a payment of an obligation of Lindley Patrick to redeem property sold to the State and to release the lien for the current taxes. When this was done by the transferee with the money paid into escrow, it was not necessary that there be formal agreement to that effect or assumption of the debts. No clear title could be obtained to the property without the liquidation of these taxes. The language of Helvering v. Taylor, 2 Cir., 1942, 128 F.2d 885, is apposite here. A corporate reorganization was made necessary by the default on bonds, the reorganization plan providing that the new company would assume some of the debts of the old company. New bonds were to be, and were actually, issued. But it was argued because there was no direct assumption of the outstanding bond issue, there was no direct reorganization. The Court of Appeals approved the language of the Tax Court which, in effect, held that the bonds of the new company were substituted for the old and that, therefore, there was, in reality, an assumption of liability:

" 'A mere statement by the new company that it assumed the obligation of the old company on its bonds would have been insufficient because they would have remained in default. Thus, a new bond issue had to be substituted for the old issue. That was one of the chief

purposes and one of the chief accomplishments of the plan. *The new company in effect did assume the bonded indebtedness of the old company, since it put itself in the place of the old company and agreed to pay the amount of principal and interest owed by the old company to the very same creditors, the holders of the old bonds.* Thus, unless there is some magic in the use of the word "assume", the present case comes within the statute.'" (At page 886.) (Emphasis added.)

So here, the delinquent taxes on property which had to be redeemed from the State, and the current taxes which were a lien upon it, were obligations on the land transferred which the corporation *assumed and paid in the escrow.*

▆ It follows (1) that the payment of interest and taxes in the escrow was the payment of an obligation of the taxpayer's predecessor, the extent and nature of which was fixed prior to the reorganization, (2) that the Tax Court was right in holding that the cash ($25,655.-77) was not additional consideration to the seller, (3) that, consequently, the property was acquired by the taxpayer in a tax-free reorganization, 26 U.S.C. § 112(g) (1) (B), and (4) that the taxpayer's basis for its real property was the same as that of its transferor. 26 U.S.C. § 113(a) (7) (B).

IV

The Purpose For Which Property Was Held

The conclusion reached upon the question of reorganization makes it necessary that we determine the correctness of the other finding of the Tax Court, that the real property was held by the taxpayer primarily for sale to customers in the ordinary course of business within the meaning of Section 117(j) (1) (B), 26 U.S.C., with the result that taxpayer's gain on the disposition of the real property is taxable as ordinary income and not as capital gain.

▆ As stated in the outset, the scope of our review is limited. 26 U.S.C.

§ 1141. We cannot substitute our judgment as to facts for that of the Tax Court, and can only upset the findings if there is no substantial evidence to support them. What is and what is not trade or business and when property is or is not held for sale to customers are questions of fact.

Provisions similar to the one under discussion have been part of our tax statutes for many years. Courts have sought to evolve criteria by which to determine whether a person or an association was engaged in business. More particularly, they have tried to establish criteria by which to determine whether real property is held for investment or sale to customers in the ordinary course of business. Many tests have been proposed by this and other courts. Among them are: (1) the nature of the acquisition of the property, (2) frequency and continuity of sales over a period of time, (3) the nature and extent of the taxpayer's business, (4) the activity of the seller about the property, such as the extent of his improvements or his activity in promoting sales, (5) the extent and substantiality of the transactions and the like. Richards v. Commissioner, 9 Cir., 1936, 81 F.2d 369, 372–373; Snell v. Commissioner, 5 Cir., 1938, 97 F.2d 891, 892; Burkhard Inv. Co. v. United States, 9 Cir., 1938, 100 F.2d 642, 645–646; Commissioner of Internal Revenue v. Boeing, 9 Cir., 1939, 106 F.2d 305, 309–310; Miller v. Commissioner, 9 Cir., 1939, 102 F.2d 476, 479–480; Ehrman v. Commissioner, 9 Cir., 1941, 120 F.2d 607, 610; Gruver v. Commissioner, 4 Cir., 1944, 142 F.2d 363, 367–368; Harriss v. Commissioner, 2 Cir., 1944, 143 F.2d 279, 280–281; White v. Commissioner, 5 Cir., 1949, 172 F.2d 629, 631; Dunlap v. Oldham Lumber Co., 5 Cir., 1950, 178 F.2d 781, 784; Rollingwood Corp. v. Commissioner, 9 Cir., 1951, 190 F.2d 263, 265–266; Palos Verdes Corp. v. United States, 9 Cir., 1952, 201 F.2d 256, 258–259.

▆ But, in the last analysis, each case must be determined upon its own specific facts, for none of these incidences

are present in all cases. And, in reviewing a finding one way or the other by the Tax Court, we must determine whether, in the light of the facts before the court, and the inferences it was free to draw from oral testimony and written documents, the conclusion is warranted.

Most of the property of the taxpayer was disposed of through a condemnation proceeding in 1945, after which only a small parcel remained which was sold for $15,000.00.

■ The acquisition of private property by condemnation is a forced sale. 29 C.J.S., Eminent Domain, § 2, p. 780; United States v. Becktold Co., 8 Cir., 1942, 129 F.2d 473, 476–477; Pedrotti v. Marin County, 9 Cir., 1946, 152 F.2d 829, 831. This Court has held a condemnation to be a "sale" under the revenue laws. Hawaiian Gas Products, Limited v. Commissioner, 9 Cir., 1942, 126 F.2d 4, 5.

We advert to the facts found by the Tax Court as to the activity of the corporation over the course of years. When the taxpayer acquired the property there had been some hope that gas and oil might be obtained on it, from tests that had previously been made.

In November, 1937, the taxpayer entered into an oil and gas lease with certain persons who thereafter assigned their interest to Utilities Petroleum Corporation. This lease provided for an in-kind royalty of 20 per cent to the taxpayer as lessor. It remained in effect with extensions until December 10, 1941. A well was drilled in 1941, but neither oil nor gas was found. In 1938 the taxpayer received $5,000.00 in cash income from Utilities Petroleum Corporation in connection with an extension of the lease, which it reported in its return for that year as rental income. No sale or exchange was involved.

The taxpayer did not farm its land but leased them to farmers for agricultural purposes, including grazing. It received rentals both in crop payments and in cash. The amount received by the taxpayer as rents from agricultural tenants, as shown on its income tax returns, were as follows:

| | | | |
|---|---|---|---|
| 1936 | 100.00 | 1941 | 10,251.63 |
| 1937 | 4,268.01 | 1942 | 11,861.35 |
| 1938 | 6,319.70 | 1943 | 12,925.66 |
| 1939 | 6,663.23 | 1944 | 8,331.41 |
| 1940 | 6,231.09 | 1945 | 1,694.04 |

The taxpayer, upon its organization, received much publicity from the local newspapers with respect to the development of its properties for industrial uses. In 1937 it joined other organizations and individuals in honoring a citizen of a nearby community by inserting in a newspaper, the Byron Times, a display advertisement, which read as follows:

"Best Wishes to a Great Builder on his Diamond Birthday.

"In our efforts to boost the Port of Stockton throughout the years we have come to appreciate your work the more through difficulties we have encountered. Our efforts are now concentrated on developing Rough and Ready Island, across the heart of which travels great Borden Highway.

"Mr. Albert Lindley, who has owned the land for 25 years; Mr. E. L. Wilhoit, president of Stockton Savings and Loan Bank; Stuart A. (sic) Rawlings, director of Bank of California, Pacific Telephone and Telegraph Company, etc., and William Wallace Mein, noted mining engineer, president of Calaveras Cement Company and director of International Nickel Company, are financially interested in the work.

"Mr. Lindley is personally retaining his fine home on the tip of the island as well as some 400 acres adjoining the municipal wharves. Mr. Wilhoit, by adding this project to his other Delta holdings—including about 5,400 acres in Byron Tract— has again demonstrated his faith in the lands. All of us look with confidence at the future of Port Stockton.

"And we know that future will bring you the happiness your splendid efforts have earned.

"Stockton Harbor Industrial Company, Manufacturing, Industrial, Wharf and Warehouse Sites. Albert Lindley, General Manager, Rough and Ready Island, Stockton, California."

In the left-hand corner of the advertisement there was a map on which was shown the Port of Stockton and the following holdings on or adjoining the island:

"A. Oil refinery and storage tanks.
B. Proposed town site.
C. Belt Line Railroad.
1. Port Stockton Oil District and wharf.
2. Grant B. Shipley holdings.
3. Residential tract, Stockton Harbor Industrial Co.
4. Industrial tract, Stockton Harbor Industrial Co.
5. Albert Lindley holdings."

In the latter part of 1939 the taxpayer engaged an attorney as its agent to effectuate the sale of part of its property for purposes of locating a shipyard thereon, to be operated by the Kaiser interests. The agent's efforts were unsuccessful but in early 1941 he interested Rheem Manufacturing Company of San Francisco and Richmond, California, in shipbuilding and attempted to effectuate the sale of the taxpayer's property for a shipyard, to be operated by Rheem. Beginning with March 4, 1941, the taxpayer from time to time, granted the agent assignable options to purchase a part of its property and entered into written agreements with him as to the compensation he was to receive for his efforts. These written agreements were in substance the same as the prior oral agreements under which the agent had worked. In the course of his efforts, the agent concluded that the prospects for leasing a part of the taxpayer's lands for use as a shipyard were better than for sale, and, with the taxpayer's approval, he attempted to lease the property for this purpose. All of the agent's efforts to create a shipyard on the island were fruitless.

The taxpayer used stationery, the letterhead of which was as follows:

"Stockton Harbor Industrial Company Wharf, Warehouse and Manufacturing Sites Stockton, California

E. L. Wilhoit, President; Stuart L. Rawlings, Executive Vice-Pres.; Albert Lindley, Vice-Pres., Gen. Mgr., Rough and Ready Island, Stockton, California."

On the back of the stationery, there was a map of the island and adjoining property, including the City of Stockton and the deep water channel. It showed property owned by the taxpayer, Albert Lindley and others. Above the map was the following statement:

"Stockton Harbor Industrial Company Two Miles of Water Frontage Visited Daily by Ocean-Going Vessels and Served by Three Transcontinental Railways."

Below the map appeared the following statement:

"Shown above is the Company's 1,-000 Acres of Manufacturing, Industrial and Warehouse Sites—California's Inland Harbor, Center of Production and Distribution—Solid Level Land, Unlimited Free Fresh Water, No City Taxes or Regulation, No Engineering Problem—For Information Address Albert Lindley, General Manager, Rough and Ready Island, Stockton, California."

This type of stationery was used by the taxpayer until it sold its property to the Navy.

Part of the island, between the channel and the Belt Line Railroad, was covered by a deep overlay of sand and gravel fill which was pumped on the island when the deep water channel was being dredged in the years immediately before

1930. The fill area was unusual among delta lands for its ability to support heavy structures without need for pilings and therefore was unusually well suited to industrial, dockage and warehouse uses. The balance of the land was capable of supporting heavy structures with pilings driven to a depth of 38 feet.

In a letter to the Internal Revenue Agent in Charge, dated September 25, 1942, the taxpayer, protesting against a proposed income tax deficiency for 1939 and 1940, stated in part:

"The corporation was organized October 16, 1936, for the purpose of holding title to real property adjacent to the Port of Stockton and with frontage extending along the San Joaquin River deep water channel. Said real property was to be offered for sale in parcels for industrial purposes. * * *

" * * * The real properties of the corporation are held primarily for sale, and in event of other than a cash transaction, profit or loss would be 'accrued' upon a sale or sales of real property."

Neither Lindley Patrick nor the taxpayer subdivided the land into sites or tracts. Lindley Patrick had considered laying out the property into defined lots for sale, but preferred to treat it as all for sale and to locate individual industries, from point to point, in accordance with their respective requirements and without permitting any haphazard or destructive selections. The taxpayer continued that policy.

In March 1942 Albert Lindley, then a director, vice-president and general manager of the taxpayer, and who operated from his residence on the island, exhibited the taxpayer's property on the island to two real estate brokers of Stockton for the purpose of acquainting them with the property and informing them of the prices at which various parcels were available for sale. It was understood that if the brokers were instrumental in bringing about the sale of any part of the properties they would receive the usual real estate agent's commission. Lindley informed them that the taxpayer was primarily interested in selling rather than leasing parcels of the property, but that consideration would be given to prospects for leases on mutually satisfactory terms.

In the normal course of events, it would take a number of years to dispose of such a large acreage as the taxpayer's island property for industrial and water frontage purposes, considering the industrial potentiality of the Stockton area.

Prior to 1942 any sales or leases of the taxpayer's property were made by direct contact between Lindley and the prospect. The taxpayer made the following sales:

"1937—13,028 acres to General Petroleum Company for $15,000.00.
1940—13.03 acres to Shell Oil Company, for $25,000.00.
1937—1.69 acres to State of California.
1940—1.78 acres to State of California."

The first two listed sales were of property fronting on the Stockton Deep Water Channel for use as oil storage and distribution facilities. The other two sales were to permit improvements by the State of California in the width and depth of the channel.

In 1943 the taxpayer sold an islet comprising 4.77 acres for $2,500.00. Selling expenses were $147.45. On April 14, 1944, the taxpayer sold 213.83 acres of land to P. Baldocchi for $42,000.00, less selling expenses of $1,139.20.

Prior to the sale to Baldocchi, the taxpayer had discussed the sale of its lands on the island to the Navy and had quoted a price of $509,550.00, in which the land later sold to Baldocchi was included at a price of $69,550.00. On August 1, 1944, an order granting the United States immediate possession was entered. The taxpayer and the United States eventually settled the fair value issue by agreeing to a price of $415,000.00 and a stipulation to that effect was filed on January

2, 1945. Judgment was entered in accordance with the stipulation and the taxpayer received payment in 1945. The taxpayer welcomed and encouraged the Navy to acquire its property on the island.

On May 23, 1945, the taxpayer sold the remainder of its real property to Albert Lindley for $15,000.00 this property consisted principally of a roughly triangular section of land across the channel from the island and adjacent to the Stockton Golf and Country Club.

After selling its property, the taxpayer's directors on July 13, 1945, adopted a resolution to dissolve. The resolution recited that the taxpayer's assets had been converted into cash and instructed the officers to make a distribution in liquidation of $200.00 a share at once and to distribute the balance after the taxpayer's tax liabilities should be determined and paid. The taxpayer has not been dissolved.

In addition to these facts, most of which were undisputed, the Tax Court had before it the deposition of E. L. Wilhoit, the chairman of the board and one of the officers of the taxpayer. He had conducted negotiations for the acquisition of the property, and was instrumental in organizing the corporation for the purpose of taking over the Lindley Patrick properties.

On direct examination by counsel for the Commissioner, Mr. Wilhoit was asked the following questions:

"Q. Well in relation to the formation of the Corporation could you place it in relation to events that occurred at that time? A. I think they investigated it before we formed the Corporation.

"Q. You are not certain of that though, are you? A. No, I wouldn't know, I am quite sure they did.

"Q. Well, wasn't the primary purpose of the Corporation to develop this property and sell it for industrial sites? A. Well, it was to farm and I suppose of course we would figure, we figured we would sell it of course like any other property we had or I had.

"Q. In the disposal of the property how was it contemplated this property would be disposed of? A. Well, that we hadn't determined at the time we bought it of course.

"Q. Well, at the time the Corporation was formed there wasn't any expectation was there on the part of the organizers that this entire property would be sold all at once was there in a lump? A. Oh no, no.

"Q. *It was anticipated at the formation of the corporation, was it not, that it would take several years to sell this property?* A. *Yes.*

"Q. *And sell it in parcels to industrial concerns?* A. *Different people, yes.*

\*     \*     \*     \*     \*     \*

"Mr. Marcussen: Just to clarify the question, now wasn't the purpose in farming this land merely to get what revenue it was possible to get pending the sale of the property, Mr. Wilhoit? A. Well not particularly, the purpose of farming it was to of course to get an income from it, that was our idea, of course we thought it would pay an income.

"Q. You didn't buy the property to hold it for the purpose, however, of operating it as farm property? A. Well, as farm property and of course one of the main things was of course this: we thought if we could get the gas or oil on it that would be—it was near town, you know, and it would be very valuable, a very valuable proposition for us if we could get gas or oil because it was so near to pipe it to town, you know. It was right on the margin of the City of Stockton.

"Q. *Am I correct in saying, however, that the primary purpose of the Corporation was to acquire this land and dispose of it and sell it was it not?* A. *Oh I suppose it was,*

*yes, probably in some future time probably, yes, if we could.*

"*Q. Well, was it not available for sale at all times from 1936 on when the Corporation was formed? A. It was for sale, oh, I suppose it was yes.*

"*Q. And in fact the Corporation itself made positive efforts did it not to sell this property right from the beginning of its formation? A. Well, I don't know that we did from the beginning, of course we sold because we had to sell when the time came and the Navy wanted it.*

"Q. When the Navy took it, but of course there had been preceding sales of various parcels from time to time? A. Oh yes, there had been a few pieces sold.

"Q. And these had been willingly entered into by the Corporation, were they not? A. Yes."

Mr. Wilhoit was the manager of the taxpayer although he referred to Lindley also as manager.

While properties were not listed with other brokers, he stated that if a sale had been made the regular commission would have been paid. He also identified advertisements, some of which are referred to in the summary of facts earlier given, which, at the time of the organization of the company, stated its purpose to develop the property as industrial property and to sell it as such as the needs of the growing community warranted.

These facts indicate that the purpose of the organization of the corporation was to deal in real estate. Its property was to be developed as industrial property. Minor farming operations were conducted while waiting, as Mr. Wilhoit correctly stated, for the ultimate sale which was the object of the acquisition of the property. The fact that the final sale did not occur for many years afterwards, when the Navy acquired the property, does not invalidate the conclusion of the Tax Court that the property was held for sale to customers in the ordinary course of trade. White v. Commissioner, 5 Cir., 1949, 172 F.2d 629.

In a matter of this character, where the purpose for which the property is acquired and held, the course of conduct and the representations and admissions of the corporation, over a period of years, show that the property was held for future development as industrial sites, it would be unrealistic to hold that the leasing of property or a portion of it for agricultural purposes, pending the development or awaiting the needs of the community, changed the entire complexion of the corporation so that it could be asserted that the property was held not for sale, but as a long term investment.

The fact that in the Articles of Corporation the right to lease was given along with the right to sell does not change the complexion of the situation. A corporation permitted to own real estate has the statutory right to lease property even if its Articles do not so provide. California Corporations Code, §§ 802, 803; McQuaide v. Enterprize Brewing Co., 1910, 14 Cal.App. 315, 319–320, 111 P. 927; Sarmento v. Bay City Land & Cattle Co., 1949, 94 Cal.App.2d 343, 347, 210 P.2d 754.

A corporation organized for the purpose, among others, of developing large tracts of land, has the right to use the land for other legitimate purposes, such as farming, pending the ripening of the market for which it was intended. Under California corporation law such acts would be considered incidental to the transaction of its business and the attainment of its corporate purposes. California Corporations Code, § 802; Bates v. Coronado Beach Co., 1895, 109 Cal. 160, 162, 41 P. 855; Woods Lumber Co. v. Moore, 1920, 183 Cal. 497, 501–503, 191 P. 905, 11 A.L.R. 549; Rabbitt v. Union Indemnity Co., 1934, 140 Cal.App. 575, 582–584, 35 P.2d 1066.

The fact that no subdivision was attempted has no significance. While it is the practice in California and elsewhere

to subdivide property held for residential purposes or for mixed residential and business purposes, large industrial sites may derive their chief value from their availability in an undivided and unmapped tract. And it can be seen readily that it might be better business policy to keep a tract of over nine hundred acres, located on an island at Stockton Harbor, ready to satisfy the needs of large industrial plants and allow them to make their own selections, rather than relegate them to choosing from predetermined sites in a subdivided tract. Hence the failure to subdivide and break up the holdings is consistent with the purpose for which the property was held.

Indeed, in Albert Lindley's conversations in 1945 with Captain Ernest E. Williams, the real estate agent of the Twelfth Naval District, which led to the acquisition by the Navy, and which he related to the Tax Court, Lindley "emphasized that it was industrial property and that is why he was holding it" and that "it was available for sale in parcels". Similar admissions were made in correspondence with the Bureau of Internal Revenue in 1942. And, no doubt, the amount of the acreage and the fact that all or most of it was available in its natural state made it very desirable from the standpoint of the Navy.

■ In what precedes we have indicated some of the facts, representations and admissions in the record which support the conclusion of the Tax Court that the property was held primarily for sale to customers in the ordinary course of business. 26 U.S.C. § 117(j) (1) (B). Our review cannot go beyond such inquiry. Gillette's Estate v. Commissioner, 9 Cir., 1950, 182 F.2d 1010, 1013–1014; Rollingswood Corp. v. Commissioner, 9 Cir., 1951, 190 F.2d 263, 265; Rider v. Commissioner, 8 Cir., 1952, 200 F.2d 524, 525.

The decision of the Tax Court is affirmed.

CHAMBERS, Circuit Judge (concurring in part and dissenting in part).

I think, as to the ordinary income or capital gains question, under the evidence the Tax Court would have been justified in finding that the property either was or was not "property used in the trade or business of the taxpayer" and "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." We should not disturb the finding on this question reached upon competent evidence.

On the question of whether the Tax Court was correct in its conclusion that the transaction by which Rough and Ready Island went into Stockton Harbor Industrial Company was a tax free reorganization, I dissent from the majority opinion. While I attach no importance to the collateral transaction of the simultaneous loan made by a stockholder of the new company to Lindley Patrick Farms, Inc., I do think the manner of handling the cash payment through escrow to pay up delinquencies on the mortgage on the property *for the account of* Lindley Patrick Farms, Inc., spoils the reorganization as a tax free reorganization, and that upon reorganization Rough and Ready Island was entitled to a new tax basis for the computation of gain.